UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ROBERT PARTLO
and ROGER PRINGLE,

    Plaintiffs,

     v.

MIKE JOHANNS, Secretary of the United
States Department of Agriculture, *et al.*,

    Defendants.

Consolidated Cases:
  Civil Action No. 04-1462 (CKK)
  Civil Action No. 04-1779 (CKK)

**MEMORANDUM OPINION**
(June 11, 2006)

Plaintiffs Robert Partlo and Roger Pringle are certified organic farmers, with farms located

in Sanilac County, Michigan, who suffered corn and soybean crop losses due to disasters in 2001.

Plaintiffs bring this action against Defendants Mike Johanns, Secretary of the United States

Department of Agriculture; the United States Department of Agriculture; and Bruce Weir,

Executive Director of the Michigan Farm Service Agency (collectively, "Defendants"), alleging that

(1) the program rules of the United States Department of Agriculture's ("USDA") 2001/2002 Crop

Loss Disaster Assistance Program ("CLDAP") are contrary to law, arbitrary and capricious, and in

violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, in that the rules do

not permit Plaintiffs to receive a special, higher assistance rate based on their cultivation practices

(in their case, organic cultivation); and (2) the program rules, by undermining the distinctions drawn

in other legislation by Congress between conventional/chemical and organic farmers, reflect an

animus toward organic farmers which ensures disparate treatment of organic farmers in violation of

the Equal Protection Clause of the Constitution.

Currently before the Court are Plaintiffs' Motion for Summary Judgment, Defendants'

Cross-Motion for Summary Judgment, Plaintiffs' Consolidated Reply Memorandum in Support of

Plaintiffs' Motion for Summary Judgment and Answer to Defendants' Cross-Motion for Summary

Judgment, Defendants' Reply Memorandum in Further Support of Defendants' Cross-Motion for

Summary Judgment, Plaintiffs' Motion to Strike the Declaration of John Johnson or Alternatively,

for Leave to File a Rebuttal Declaration, Defendants' Opposition to Plaintiffs' Motion to Strike, and

Plaintiffs' Reply in Support of Plaintiffs' Motion to Strike.  Upon a searching examination of the

parties' filings, the attached exhibits, the relevant case law, and the entire administrative record

herein, the Court shall deny Plaintiffs' Motion for Summary Judgment, grant Defendants' Cross-

Motion for Summary Judgment, and deny Plaintiffs' Motion to Strike.

## I: BACKGROUND

A.      *Disaster Relief – Statutory and Regulatory Background*

1.      Pre-1998 Disaster Relief Program Rules

Prior to 1998, USDA regulations under an older disaster relief statute enacted by Congress

in 1995 stated, *inter alia*, that "separate payment rates and yields for the same nonprogram crop

shall be established, in accordance with instructions issued by the Deputy Administrator, when there

is supporting data from [the National Statistics Service ("NASS")] or other sources approved by

CCC [the Commodity Credit Corporation]."  7 C.F.R. § 1477.6 (1995).  The Secretary of the

USDA ("the Secretary") during this period interpreted that regulation, in accordance with

administrative instructions, to permit higher payment rates and yields for different "end uses" of the

same crop.  "End use means the purpose for which the harvested crop is used, such as grain, hay or

seed[,]" 7 C.F.R. § 1480.3 (2005), or, as stated in a previous rule, such as, "fresh, processed, or

juice[,]" 7 C.F.R. § 1477.103 (2002).  Based on this interpretation, the Secretary did not distinguish

between crops grown using conventional/chemical practices and crops grown using organic practices – that is, the Secretary did not believe that growing crops organically was an "end use" in and of itself. Under this interpretation, because organically-produced apples and conventionally-produced apples have the same "end use" (i.e., being made into apple juice), a farmer who had suffered losses to a portion of his chemically-grown apples would be compensated at the same rate that a farmer who suffered similar losses to a portion of his organically-grown apples. *See* Decl. of John Johnson, Deputy Administrator for Farms Programs of the Farm Service Agency ("FSA") of the USDA ("Johnson Decl.") ¶ 6; *Pringle v. United States*, Case No. 97-CV-60342-AA, 1998 U.S. Dist. LEXIS 19378, at *16-*19 (E.D. Mich. Dec. 9, 1998).

> 2. The *Seibel* and *Pringle* Decisions

At least two sets of certified organic farmers challenged the USDA's failure to establish different disaster relief payment rates for organic farmers under the USDA's pre-1998 disaster relief rules, which resulted in a 1996 USDA administrative determination, *Seibel v. Farm Service Agency*, NAD Log No. 95001879W (USDA Nat'l Appeals Div., Jan. 23, 1996), and an unpublished 1998 decision by the United States District Court for the Eastern District of Michigan, *Pringle v. United States*, Case No. 97-CV-60342-AA, 1998 U.S. Dist. LEXIS 19378 (E.D. Mich. Dec. 9, 1998). Both challenges resulted in favorable decisions for the plaintiff farmers.

In *Seibel*, the FSA apparently did not use the Secretary's "end use" interpretation as a defense; rather, the FSA appears to have only argued that higher rates for organic crops were not justified because of its assertion that "[t]here are no recognized United States rules governing what is considered organically grown." *Seibel*, NAD Log No. 95001879W, at 3, 5. In contrast, the plaintiff farmers, located in New Mexico, contended that (1) they were certified as organic farmers by the New Mexico Organic Commodity Commission, (2) there was data on the average price rates

for organic crops available for use under the disaster relief payment system, as documented by the

State Committee ("STC"), and (3) there was good reason to pay organic farmers more in disaster

relief, given that their crops are the result of different seed, more intensive labor, and a careful

cultivation methodology.  *Id.* at 3-4.  Upon a review of the relevant arguments, the NAD sided with

the plaintiff farmers, reversing the FSA's previous determination but including little explanation

outside of a finding that "separate payment rates" should be established for organic farmers pursuant

to 7 C.F.R. § 1477.6 because there was now "supporting data" for those distinctions.  *Id.* at 3, 5.

In *Pringle*, a collection of organic farmers located in Michigan who had suffered disasters,

including one of the Plaintiffs in this case, Roger Pringle, relied upon the NAD's decision in *Seibel*

to bring a similar challenge.  *See Pringle*, 1998 U.S. Dist. LEXIS 19378, at *21.  In contrast to

*Seibel*, the USDA relied upon the Secretary's "end use" interpretation of 7 C.F.R. § 1477.6 in its

attempt to justify equivalent relief rates for both organic and conventional farmers.  *See id.* at *16-

*19.  In response to this contention, the plaintiff farmers "argued that their organically grown beans

were for a different 'end use' than chemically grown beans because their customers contracted for

certified organic goods and were willing to pay a premium for crops so certified."  *Id.* at *19.

Relying heavily upon *Seibel*, the *Pringle* court concluded that the Secretary's refusal to differentiate

between disaster relief rates for organic and conventional farmers under 7 C.F.R. § 1477.6 was

arbitrary and capricious because the plaintiff farmers had

> demonstrated, and defendants have not disputed, that their organically grown beans
> demand a significantly higher price in the marketplace than chemically grown beans,
> and that this price reflects the fact that organically grown crops are more expensive
> to cultivate and have a separate customer base that is willing to pay a premium for
> certified organic foods.

*Id.* at *22.  In making this determination, the *Pringle* court stressed that organic crops were grown

for a separate, specialized market and required a certification that no chemicals were used; as such,

contrary to the Secretary's interpretation, the court concluded that organic crops actually had a

separate "end use" from conventional crops. *See id.* at *22-*23 ("Just as a fresh apple and a

processed apple are treated differently for purposes of disaster payment rates, so should organic and

non-organic crops."). Because organic crops had a separate "end use," the *Pringle* court concluded

that the Secretary interpretation of his own rules was erroneous. *Id.*

    3.   <u>The 1998 CLDAP</u>

    Following the 1998 decision by the United States District Court for the Eastern District of

Michigan in *Pringle*, the USDA altered the parameters of its Crop Loss Disaster Assistance Program

("CLDAP").[1]  As such, it can be said that "[t]he modern series of USDA disaster assistance

programs began with the statute and program that assisted farmers for losses in the 1998 crop, or for

multiyear losses in the 1998 and preceding crop years."  Johnson Decl. ¶ 5; *see* Pub. L. No. 105-

277, 112 Stat. 2681, 2681-43, at § 101(a), Division A, Title XI, § 1102 (1998); 64 Fed. Reg.

18553 (Apr. 15, 1999), codified at 7 C.F.R. § 1477 (2002).  The 1998 CLDAP was part of the

Omnibus Consolidated and Emergency Supplemental Appropriations Act of 1999 ("the 1999

Appropriations Act"), wherein Congress appropriated, as an emergency measure, $1.5 billion to

"producers on a farm who have incurred losses in the 1998 crop due to disasters," 1999

Appropriations Act § 1102(b), 112 Stat. at 2681-43, and $200 million "to make available livestock

feed assistance to livestock affected by disasters," *id.* § 1102, 112 Stat. at 2681-44; *see also* Signing

Statement of President William J. Clinton, 1998 U.S.C.C.A.N. 576, 579 (noting that the act was to

---

    [1] For ease of reference, the Court refers to the series of disaster assistance legislation
beginning in 1998 as "CLDAPs," and by the year(s) covered by the programs rather than the year of
enactment.

fund "urgent needs on an emergency basis")..

In the 1999 Appropriations Act, Congress stressed four important aspects of its delegation to the USDA. *See generally McDaniels v. United States*, 300 F.3d 407, 408-09 (4th Cir. 2002) (discussing the implementation of the 1998 CLDAP). First, Congress directed that the Secretary distribute the disaster relief in a "fair and equitable manner," 1999 Appropriations Act § 1101(a), 112 Stat. at 2681-42, and empowered the Secretary to determine "eligibility and payment limitation criteria," *id*. § 1101(b)(3), 112 Stat. at 2681-42. *See also id*. § 1102(a), 112 Stat. at 2681-44 ("The Secretary shall administer a program under which emergency financial assistance is made available to producers on a farm who have incurred losses associated with crops due to disasters (*as determined by the Secretary*).") (emphasis added). Second, to "implement" the 1999 Appropriations Act, Congress instructed the Secretary and the CCC, "as appropriate," to issue "such regulations as are necessary" "[a]s soon as practicable after the date of enactment." *Id*. § 1133(a), 112 Stat. at 2681-47. Third, Congress directed that the regulations be promulgated "without regard to the notice and comment provisions of section 553 of title 5, United States Code [the Administrative Procedure Act]," the Statement of Policy of Secretary of Agriculture, effective July 24, 1971 (36 Fed. Reg. 13804), relating to notices of proposed rulemaking and public participation in rulemaking, and the Paperwork Reduction Act. *Id*. § 1133(a), 112 Stat. at 2681-47 (internal subdivision omitted). Fourth, and finally, Congress provided that any such regulations take effect immediately under 5 U.S.C. § 808, before congressional review is undertaken pursuant to 5 U.S.C. § 801. *Id*. § 1133(b), 112 Stat. at 2681-47.

In accordance with Congress' instructions, the USDA issued regulations for the implementation of the 1998 Single-year and Multi-year Crop Loss Disaster Assistance Program and Emergency Livestock Assistance. *See* 7 C.F.R. §§ 1477, 1439. Under the Secretary's rules for the

1998 CLDAP, a slight but significant change/clarification was put in place:

> Separate payment rates and yields for the same crop may be established according to instructions issued by the Deputy Administrator, when there is supporting data from NASS or other sources approved by CCC that show there is a significant difference in yield or value based on a distinct and separate end use of the crop. *In spite of differences in yield or values, separate rates or yields shall not be established for crops with different cultural practices, such as organically or hydroponically grown.*

7 C.F.R. § 1477.202(d) (2002) (emphasis added).[2]  "Cultural practices" refers not to the culture of society but, rather, to cultivation:  "cultural practices are practices used in cultivation of agricultural products," including organic cultivation.  Johnson Decl. ¶ 9; *see also* 7 C.F.R. § 718.2 (using "cultural practices" in definition of "skip-row or strip-crop" cultivation methods); *id.* § 783.6(a)(2) (in the context of the Tree Assistance Program, discussing "[s]ite preparation and debris handling within normal cultural practices for the type of individual stand being re-established and necessary to ensure successful plant survival").

As such, under the 1998 CLDAP, which made no reference to prior programs, and the Secretary's 1998 CLDAP rules, disaster assistance payments do not vary depending on the cultivation practices employed; rather, farmers who use special cultivation practices, such as organic farming, are treated the same as all other farmers for the purposes of relief.  For example, an organic farmer cannot obtain a higher payment rate because his products fetch a higher market price based on their organic cultivation; however, the organic farmer (like any other farmer) could obtain

---

[2] Plaintiffs in this case label this change/clarification, which eliminated the possibility of different relief rates for organic farmers, the "organic prohibition."  *See, e.g.*, Pls.' Mot. for Summ. J. at 4, 10.  In contrast, Defendants refer to the additional language as the "cultural practices clarification."  *See, e.g.*, Defs.' Cross-Mot. for Summ. J. at 17.  Each "label" is essentially pejorative (in favor of the proponent).  Rather than engage in a Hobson's choice between two unappealing alternatives, the Court shall instead refer to the post-1998 change as "the 1998 revision."

additional assistance if he showed that, *e.g.*, the apples he intended to be sold as fresh were damaged by a disaster and, therefore, could only be sold for a different end use (such as juice) with a lower price as determined by the USDA's Risk Management Agency ("RMA").

Given that Congress explicitly exempted the 1998 CLDAP from the notice and comment provisions of the APA, the Statement of Policy of Secretary of Agriculture, effective July 24, 1971 (36 Fed. Reg. 13804), relating to notices of proposed rulemaking and public participation in rulemaking, and the Paperwork Reduction Act, *see* 1999 Appropriations Act § 1133(a), 112 Stat. at 2681-47 (internal subdivision omitted), the USDA admittedly did not develop much of a record at the time of the enactment regarding the 1998 revision. *See* Defs.' Cross-Mot. for Summ. J. at 25-29; *but see* 64 Fed. Reg. at 18553-54 (Apr. 15, 1999), codified at 7 C.F.R. § 1477 (2002) ("Because funding for the program is limited . . . ."; "The Secretary has been given a wide discretion in the implementing of the 1999 Act and these rules will be consistent with the existing Federal policies and with the understanding of the desire of Congress to attempt to alleviate the shortcomings in the current programs.  These rules will, in addition, allow relief to made available quickly, and effectively, within the limits of the funding available for this program.").

However, in the December 12, 2005 Declaration submitted in this litigation by John Johnson, who has served as Deputy Administrator of the FSA of the USDA since 2002, wherein he has been "the principal FSA employee charged by the FSA Administrator with the operation of USDA disaster programs," Johnson Decl. ¶ 1, Johnson contends, *post-hoc*, that "[t]he Secretary's decision not to pay special rates for special cultivation practices" was based on a consideration of four factors:

> A.    Speed is a critical factor in disaster assistance programs, as Congress has
>        made clear.  *See* Pub. L. No. 105-277, 112 Stat. 2681-47, at § 1133 of
>        Section 101(a) of Division A (directing the Secretary to provide disaster

assistance "as soon as practicable").  But verifying disaster assistance payments based on a farmer's asserted use of particular cultivation methods would require increased individualized determinations and verification, adding greatly to the program's administrative burden and slowing it down while sapping disproportionate resources.  In the 1998 program, those resources came from a limited, lump-sum appropriation.

B.    It would also have been extremely difficult to determine what crops were, indeed, produced with a particular cultivation method.  For example, there were no federal organic standards in place for the 1998 crop year; it was and is, therefore, unclear what qualified as an organic crop at that time. Moreover, since USDA's organic producer certification program regulations did not become effective until 2001, and were not fully implemented until October 21, 2002, there was no way to independently verify whether producers used particular cultivation methods in 1998.  *See* 65 Fed. Reg. 80548 (December 21, 2000) (codified at 7 C.F.R. Part 205).

C.    While the national program was designed to be implemented quickly, per Congressional direction, there was no reliable price and yield data for organic crops in 1998 on which the FSA could have based fair, reliable grants of disaster assistance.

D.    The Secretary designed the program to treat all producers fairly and equally, regardless of their cultural practices, because it was intended simply to provide basic, emergency benefits to farmers whose crops were damaged due to disaster.  Unlike certain other USDA programs, the disaster program was not intended to regulate producers' behavior or to encourage certain cultural practices over others, even if the market rewards those practices.  Thus, a poorly skilled apple farmer using conventional cultivation methods who loses a crop of fresh apples is paid the same as a neighboring farmer who is more highly skilled and produces a better crop of fresh apples that would fetch a higher market price.  By the same token, a third adjacent farmer who may receive a higher market price for his fresh apples based on his cultivation methods is also paid that same, basic price.

*Id*. ¶ 11.

4.    The 1999 CLDAP

Under the 1999 crop year program, Pub. L. No. 106-78, 113 Stat. 1135, 1175, Title VIII § 801 (1999), Congress directed the Secretary to administer the 1999 program in the same manner as the 1998 CLDAP.  *Id.* § 801(b) ("The Secretary shall make [disaster] assistance available under

this section in the same manner as provided under section 1102 of the Agriculture, Rural

Development, Food and Drug Administration, and Related Agencies Appropriations Act, 1999");

*see also* 65 Fed. Reg. 7942 (Feb. 16, 2000), codified at 7 C.F.R. § 1478 (2002).

      5.      The 2000 CLDAP

Congress, through the 2000 crop year disaster assistance program, also directed the

Secretary to continue administering the program according to the parameters set out in the 1998

CLDAP. *See* Pub. L. No. 106-387, 114 Stat. 1549, 1549A-55, Title VII § 815(b)(1) (2000) ("the

Secretary shall make assistance available under this section in the same manner as provided under"

the 1998 CLDAP); *see also* 66 Fed. Reg. 15976 (Mar. 21, 2001), codified at 7 C.F.R. § 1480

(2002).

      6.      The 2001/2002 CLDAP

Under the 2001/2002 crop years disaster program, Congress instructed the Secretary to

make disaster assistance available in the same manner as he did under the 2000 crop year program.

*See* Pub. L. No. 108-7, 117 Stat. 11, 538, Division N § 202(b)(2) (2003).  Congress also again

authorized the Secretary to promulgate implementing regulations, and exempted those regulations

from, *inter alia*, APA notice and comment requirements.  *Id.* § 217; *see also* Fed. Reg. 37936 (June

26, 2003), codified at 7 C.F.R. § 1480 (2004).

However, under the 2001/2002 CLDAP, a farmer could be paid for losses in one of those

crop years, but not both:  even if a farmer had suffered disaster-related and otherwise eligible losses

in both crop years, he could only receive assistance for losses in one year and, therefore, was forced

to choose.  *Id.* § 202.  To be eligible for assistance, a disaster must have prevented the producer from

planting the crop, caused the producer to sustain a loss in excess of 35 percent of the expected

production of the crop, or caused a loss of product quality in excess of 20 percent of the expected

value of a crop.  7 C.F.R. § 1480.11(a).  The producer had to apply to the FSA for assistance before

January 30, 2004.  *Id.* § 1480.5.

Payments for losses with respect to a "yield-based" crop, such as corn or soybeans, were

calculated by multiplying the payment rate established for the crop by CCC and the loss (in excess

of 35%) as determined by CCC.  *Id.* § 1480.12(a)(1).  The payment rate for the 2001 or 2002 crop

year was 50 percent of the maximum established by the USDA RMA price for insured crops (i.e.,

those crops where the producer actually bought insurance), 50 percent of the State average price for

non-insurable crops (i.e., those crops – regardless of cultivation method – for which no RMA

insurance could be obtained), and 45 percent for the maximum established RMA price for uninsured

crops (crops for which the producer could have obtained RMA coverage, but did not).  *Id.* §

1480.12(b).  Up to three separate payment rates and yield for the same crop could have been

established by the USDA when there was supporting data from NASS or other sources, approved by

CCC, that indicated that there was a significant difference in yield or value based on distinct and

separate end uses of the crop.  *Id.* § 1480.12(d).  This meant that, for example, for apples, there

could be separate rates for a "fresh apple" end use or an "apple juice" end use, but the same rates

would apply to an organic apple used for juice and a conventional apple used for juice since *juice* is

the end use of both apples.  *Id.*

7.    The 2003, 2004, and 2005 CLDAP

In the disaster assistance program for the crop years 2003, 2004, and 2005, *see* Pub. L. No.

108-324, 118 Stat. 1220, 1232, Division B § 101(a) (2004), Congress – as it had previously –

directed the Secretary to make disaster assistance for the enumerated crop years available in the

same manner as he did under the 2000 crop year program.  *Id.* § 101(a)(3); *see also* 70 Fed. Reg.

15725-01 (Mar. 29, 2005), codified at 7 C.F.R. § 1479.

B.      *Other Agricultural Assistance Programs*

Congress has enacted various other, non-emergency agricultural assistance programs in recent years.  Two are worth noting for the purposes of this dispute.  Under the 1996 Farm Bill, Pub. L. No. 104-127, 110 Stat. 888 (1996), Congress allowed producers on farms with a history of production of certain crops (i.e., "program crops," which are crops for which the FSA runs long-term support programs) to receive Production Flexibility Contract ("PFC") payments, regardless of whether the producers were currently growing the crop.  Those who *did* grow the relevant crops could also obtain assistance by way of support "Marketing Loans" at a set, national average loan price.  7 U.S.C. § 7231.  The farmer could choose to forfeit the crop to the government and keep the loan amount.  If the market price for the crop was less than the loan rate, the farmer could repay the loan at a rate lower than the loan rate.  *Id.* §§ 7234, 7235 (1996).  Marketing Loans were available for both soybeans and corn in 2001.  *See* 7 C.F.R. § 1421 (2002).  However, the PFC payment rates and marketing loan rates under the 1996 Farm Bill were the same for a specific crop, e.g., for all corn and all soybeans, regardless of the cultural practices used to produce them.  Accordingly, under the 1996 Farm Bill, there was no special recognition of particular cultivation practices, including organic farming.

In the Farm Security and Rural Investment Act of 2002, Pub. L. No. 107-171, 116 Stat. 134 (2002) ("the 2002 Farm Bill"), Congress authorized the Direct and Counter-cyclical Payment Program ("DCP") for crop years 2002 through 2007.  The DCP made available Direct Payments ("DPs") and Counter-cyclical Payments ("CPs") for farms with a program crop production history.  *See generally* 7 U.S.C. § 7901 *et seq.*  The DP is based upon a calculation that takes the farm's production history, yield, and the statutorily-set payment rate into account.  *Id.* § 7913(c); *see also id.* § 7914(d) (calculation of CPs).  Marketing loans also remain available.  *Id.* §§ 7931, 7935.

Similar to the 1996 Farm Bill, the DP and CP rates and the marketing loan rates are the same for a

specific crop, e.g., for all corn and all soybeans, regardless of the cultural practices used to produce

them.  Accordingly, under the 2002 Farm Bill, there is no special recognition of special cultivation

practices –  including organic farming – in its award of DPs, CPs, and marketing loans.  However,

the 2002 Farm Bill does contain several initiatives by Congress that reveal a distinction between

organic production methods and conventional/chemical methods in other areas.  *See, e.g.*, *id.* § 7218

(Organic Agriculture Research & Extension Initiative), § 7407 (Organic Production & Market

Initiatives), § 7408 (International Organic Research Collaboration), § 7409 (Report on Producers &

Handlers of Organic Agricultural Products), § 10606 (National Organic Certification Cost-Share

Program), § 10607 (Exemption of Certified Products from Assessments).

      C.      *The Organic Foods Production Act and National Organic Program*

      While not an assistance program, also indirectly relevant to this dispute is the Organic Foods

Products Act, 7 U.S.C. §§ 6501-6522 ("OFPA"), enacted by Congress in 1990.  The purpose of

OFPA is "(1) to establish national standards governing the marketing of certain agricultural

products as organically produced products; (2) to assure consumers that organically produced

products meet a consistent standard; and (3) to facilitate interstate commerce in fresh and processed

food that is organically produced." *Id.* § 6501.  The Senate Report accompanying OFPA noted that

a "lack of consistent standards for production" had resulted in a plethora of conflicting standards and

a "confusing array of private and State labels."  S. Rep. 101-357, 1990 U.S.C.C.A.N. 4656, 4943

(July 6, 1990).  For the purpose of creating uniform national standards for organic foods, OFPA

establishes a national certification program for the producers and handlers of organic products, and

also establishes standards for the labeling of organic products.  *See* 7 U.S.C. §§ 6503(a), 6504,

6505(a)(1)(A).  In order to be labeled "organic," "an agricultural product must be produced and

handled without the use of synthetic substances [not appearing on the National List], and in accordance with an organic plan agreed to by an accredited certifying agent and the producer and handler of the product." *Harvey v. Veneman*, 396 F.3d 28, 32 (1st Cir. 2005) (citing 7 U.S.C. §§ 6504, 6505). Only products meeting these requirements may be labeled as "organic" and bear the USDA organic seal. *See* 7 U.S.C. § 6505(a).

OFPA also authorized the Secretary to promulgate regulations "to carry out" the Act. 7 U.S.C. § 6521. OFPA further explicates the standards for acceptable organic production practices and certifiable organic plans, *id.* §§ 6506-6513, and the development of a list of acceptable and prohibited substances, *id.* § 6517; in addition, OFPA orders the establishment of a National Organic Standards Board to advise and make recommendations to the Secretary. *Id.* § 6518. Under the OFPA, the Secretary has promulgated the National Organic Program ("NOP") providing for, *inter alia*, certification of organic products. The final rule establishing the NOP was published on December 21, 2000, and became effective on October 21, 2002 – well over ten (10) years after Congress actually passed the OFPA. *See* 65 Fed. Reg. 80548 (Dec. 21, 2000) (codified at 7 C.F.R. § 205). The final rule contains detailed standards for certification, pursuant to which a producer or handler may label its final product according to a four-tiered scheme as "100% organic," "organic," "made with organic [ingredients]," or "organic [ingredients]," depending on the percentage of organic contents. *See* 7 C.F.R. §§ 205.300-305. All products in the first three categories must identify the certifying agent and may bear the mark of an agent, although only the products in the first two categories may bear the USDA organic seal. *Id.* A certifying agent must certify any applicant who meets the requirements of the NOP – that is, the agent cannot impose additional standards for the use of its certifying mark. *See id.* § 205.501(b)(2); *see also Harvey*, 396 F.3d at

14

44-45 (upholding these regulations).

Unlike the CLDAPs and other assistance programs described *supra*, neither the OFPA nor the NOP creates emergency or other financial support for agricultural producers. Rather, by themselves, the OFPA and NOP simply establish a certification program for organic products. Indeed, the OFPA and NOP do not guarantee minimum prices for organic products, nor do they require any special payments to producers based on special cultivation practices such as organic farming, in the disaster assistance context or otherwise.

D.     *The Factual Background of This Dispute*

Plaintiffs Robert Partlo and Roger K. Pringle ("Plaintiffs") are certified organic farmers with farms located in Sanilac County, Michigan. *See* Pls.' Resp. to Defs.' Stmt. of Mat. Facts Not in Dispute ("Pls.' Resp.") ¶ 1; Defs.' Resp. to Pls.' Stmt. of Mat. Facts Not in Dispute ("Defs.' Resp.") ¶ 1. Plaintiffs grew certified organic corn and soybeans in crop year 2001, and suffered losses on a portion of these crops due to natural disaster. Pls.' Resp. ¶ 1; Defs.' Resp. ¶¶ 2, 6. There was no special crop insurance specifically for certified organic products at that time; however, insurance was nonetheless available for corn and soybeans, regardless of the cultivation methods used to grow them. Pls.' Resp. ¶ 1; *see also* Partlo A.R. at 7, 11, 29, 77, 83, 185-89, 223 ("whether or not the crops were insurable in 2001 is not relevant to the current dispute, which is whether the provisions in the agency regulations authorize FSA to establish separate rates for organically grown crops"); Pringle A.R. at 13, 23, 117-23, 139. Plaintiffs had not obtained any crop insurance for their lost crops. *See* Partlo A.R. at 219-227; Pringle A.R. at 136-143.

As such, Plaintiffs sought relief for their losses under the 2001/2002 CLDAP operated by Defendants. Defs.' Resp. ¶ 7. Plaintiffs applied for, and received, assistance for their losses under the 2001/2002 CLDAP. Pls.' Resp. ¶ 4; Defs.' Resp. ¶¶ 8, 11. However, Plaintiffs were unhappy

with the amount of assistance that they were awarded, as Defendants denied Plaintiffs' requests to establish a separate payment rate for their organic crops. Pls.' Resp. ¶ 4; Defs.' Resp. ¶¶ 11-12. Rather, Plaintiffs contended that they "received disaster benefits in am [sic] amount appropriate for conventional crops, but they should have received a separate and higher end rate for their certified organic crops." Pls.' Resp. ¶ 4.[3] Central to Plaintiffs' claim was their understanding that, in the crop year 2001, Plaintiffs' certified organic crops were more valuable per bushel in the public marketplace than the per bushel payment rate provided by the CLDAP for corn and soybeans grown in Michigan. *See* Defs.' Resp. ¶ 17.[4] The FSA, acting pursuant to its interpretation of the 2001/2002 CLDAP rules and, specifically, the 1998 revision at 7 C.F.R. § 1480.12(d), declined to recognize Plaintiffs' desired distinction. Pls.' Resp. ¶ 5; Defs.' Resp. ¶¶ 12-13. Plaintiffs appealed that determination, exhausting their administrative remedies on all claims advanced in this case. Pls.' Resp. ¶ 5; Defs.' Resp. ¶ 14.

Following the denial of their appeals, Plaintiffs brought separate actions before this Court against Defendants Mike Johanns, Secretary of the USDA; the USDA itself; and Bruce Weir, Executive Director of the Michigan Farm Service Agency (collectively, "Defendants"). Plaintiff

---

[3] The 2001/2002 CLDAP paid $2.05 per bushel for all corn in Michigan, whether conventional or organic. Defs.' Resp. ¶ 15. The 2001/2002 CLDAP paid $5.26 per bushel for soybeans in Michigan, whether conventional or organic. *Id*. ¶ 16.

[4] Defendants contend that Plaintiffs' record citations do not establish that Plaintiffs' certified organic crops were more valuable per bushel than the CLDAP per bushel payment rate in Michigan for crop year 2001. *See* Defs.' Resp. ¶ 17. Upon a review of the evidence submitted by Plaintiffs, the Court concludes that Plaintiffs have established the higher value of their product in the marketplace. As the *Pringle* court noted, "[i]f the two products [i.e., organic v. conventional crops] were truly identical, . . . the organic farmers would be hard pressed to find a buyer willing to pay significantly more for their product." *Pringle*, 1998 U.S. Dist. LEXIS, at *22-*23. Instead, "organically grown [products] demand a significantly higher price in the marketplace than chemically grown [products] . . . [e]ven if the buyers are merely paying for the organic name, as consumers in the clothing industry do for their favorite designer labels." *Id*.

Robert Partlo filed his Complaint on August 27, 2004, *see* Partlo Compl. (Civ. No. 04-1462), while

Plaintiff Roger K. Pringle brought his action on October 15, 2004, *see* Pringle Compl. (Civ. No. 04-

1779).  On April 4, 2005, pursuant to the parties' Joint Motion to Consolidate Cases, this Court –

pursuant to Local Rule of Civil Procedure 40.5(d) – consolidated the respective actions.  Following

this consolidation, the parties filed the administrative record in this matter on July 1, 2005, and

Plaintiffs submitted their First Consolidated Complaint for Reversal of Administrative Decision,

Declaratory Judgment and Request for Equitable Relief and Attorney's Fees on August 15, 2005.

Plaintiffs' First Consolidated Complaint revolves around two central assertions:  (1) the USDA's

program rules under the 2001/2002 CLDAP are contrary to law, arbitrary and capricious, and in

violation of the APA, 5 U.S.C. §§ 701 *et seq.*, in that the rules do not permit Plaintiffs to receive a

special, higher assistance rate based on their cultivation practices (in their case, organic cultivation);

and (2) the program rules, by undermining the distinctions drawn in other legislation by Congress

between conventional/chemical and organic farmers, reflect an animus toward organic farmers

which ensures disparate treatment of organic farmers in violation of the Equal Protection Clause of

the Constitution.  *See generally* First Consol. Compl.

　　　　　Pursuant to the briefing schedule set forth by the parties and adopted by the Court, Plaintiffs

filed a Motion for Summary Judgment along with a Memorandum of Points and Authorities in

Support thereof.  Defendants responded with a Cross-Motion for Summary Judgment.  Plaintiffs

then filed a Consolidated Reply Memorandum in Support of Plaintiffs' Motion for Summary

Judgment and Answer to Defendants' Cross-Motion for Summary Judgment, while Defendants

countered with their Reply Memorandum in Support of Defendants' Cross-Motion for Summary

Judgment.  In addition to the parties' cross-motions for summary judgment, Plaintiffs filed a Motion

to Strike the Declaration of John Johnson or Alternatively, for Leave to File Rebuttal Declarations,

17

which contends that the Johnson Declaration, attached to Defendants' Cross-Motion for Summary

Judgment, is a *post-hoc* rationalization that falls outside of the proper purview of a court's review

under the APA. Defendants' filed an Opposition to Plaintiffs' Motion to Strike, and Plaintiffs filed a

Reply in Support of their Motion to Strike, completing the relevant briefing in this case.

## II: LEGAL STANDARDS

A party is entitled to summary judgment if the pleadings, depositions, and affidavits

demonstrate that there is no genuine issue of material fact in dispute and that the moving party is

entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638

(D.C. Cir. 1994). Under the summary judgment standard, Defendant, as the moving party, bears the

"initial responsibility of informing the district court of the basis for [its] motion, and identifying

those portions of the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits which [it] believe[s] demonstrate the absence of a genuine issue of

material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265

(1986). Plaintiff, in response to Defendants' motion, must "go beyond the pleadings and by [his]

own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific

facts showing that there is a genuine issue for trial." *Id.* at 324 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the

nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary

judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d

202  (1986). To be material, the factual assertion must be capable of affecting the substantive

outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible

evidence that a reasonable trier-of-fact could find for the nonmoving party. *Laningham v. U.S.

Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251, 106 S.Ct. 2505

(the court must determine "whether the evidence presents a sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). "If

the evidence is merely colorable, or is not sufficiently probative, summary judgment may be

granted." *Liberty Lobby*, 477 U.S. at 249-50, 106 S.Ct. 2505 (internal citations omitted). "Mere

allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper

motion for summary judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996). The

adverse party must do more than simply "show that there is some metaphysical doubt as to the

material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct.

1348, 89 L.Ed.2d 538 (1986). Instead, while the movant bears the initial responsibility of

identifying those portions of the record that demonstrate the absence of a genuine issue of material

fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is

a *genuine issue for trial*.'" *Id.* at 587, 106 S.Ct. 1348 (citing Fed. R. Civ. P. 56(e)) (emphasis in

original).

### III: DISCUSSION

Plaintiffs' Complaint may be divided into two separate sets of allegations: (1) a contention

that the 1998 revision "violates equal protection by classifying similarly situated farmers in a

manner that bears no rational relationship to a legitimate, articulated governmental purpose and

erases economic distinctions between certified farmers that may access the interstate market for

certified organic products and hobby farmers that may not," Pls.' Mot. for Summ. J. at 22; and (2)

an argument that the USDA's "creation and application" of the 1998 revision "fails arbitrary and

capricious review," and lacks a "reasoned basis," *id.* at 12, 14. Given the neat division in Plaintiffs'

claims, the Court shall begin its analysis by first examining Plaintiffs' Equal Protection challenge.

Following this analysis, the Court shall turn its inquiry to Plaintiffs' APA-related claims.

A.      *Plaintiffs' Equal Protection Claim*

Plaintiffs' Equal Protection claim revolves around their argument that the 1998 revision "on its face lacks a rational basis because it ignores the separate market for organic products created by Congress and denies federal program benefits to organic farmers that are available to conventional farmers." Pls.' Consol. Reply at 30.  Plaintiffs identify two specific Equal Protection violations at issue with respect to the USDA's 1998 revision and subsequent re-adoption of that provision in the 2001/2002 CLDAP.  First, Plaintiffs contend that the 1998 revision and its subsequent re-enactments have created a "wholly arbitrary scheme for distributing benefits" whose irregular distinctions eviscerate the guarantee of equal protection.  *See* Pls.' Mot. for Summ. J. at 24 (citing *Zobel v. Williams*, 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982) (finding that Alaskan oil distribution scheme based on length of residency violated Equal Protection Clause)).[5]  Second, Plaintiffs assert that the 1998 revision, and its re-enactment within the 2001/2002 CLDAP, reflect "an animus driven desire to burden an unpopular group," *id.* (citing *Dep't of Agric. v. Moreno*, 413 U.S. 528, 534, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973) ("bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest").  According to Plaintiffs, "[t]he only apparent purpose to denying organic farmers the opportunity to present a claim for a separate payment rate is to burden and harm a discrete group within the farming community." *Id.* at 22.  Plaintiffs support this contention by reasoning that "[b]ecause the [1998

---

[5] In support of this proposition, Plaintiffs also cite *Beach Communications v. Federal Communications Corporation*, 959 F.2d 975 (D.C. Cir. 1992), a case in which the D.C. Circuit eventually held that the provision in the Cable Communications Policy Act requiring local franchising of satellite master antenna and television facilities, but not private or wholly internal facilities that also used no public rights-of-way, violated the Equal Protection Clause.  *See* 965 F.2d 1103 (D.C. Cir. 1992).  Unfortunately for Plaintiffs, the Supreme Court reversed this holding in *Federal Communications Corporation v. Beach Communications*, 508 U.S. 307, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993), and upheld the distinction upon rational basis review.

revision] effectively reversed the *Pringle* court's construction of the disaster program rules and undermines the distinctions drawn by Congress when it created the separate market for organic food products, it reflects negative animus toward organic farmers." *Id.* at 23.  While providing virtually no background details, Plaintiffs proclaim that "[w]hile not belaboring this point, bias against organic agriculture at the USDA has been noted from time to time." *Id.*  As such, Plaintiffs conclude that "[t]he only purpose of the [1998 revision], harming non-conventional farmers, is not a legitimate state purpose." *Id.*

      1.    <u>Applicable Equal Protection Standards</u>

      The Supreme Court has warned that, "[w]hether embodied in the Fourteenth Amendment or inferred from the Fifth, equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Fed. Commc'ns Comm'n v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993).  Rather, "[i]n areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is *any reasonably conceivable* state of facts that *could* provide a rational basis for the classification." *Id.* (citiations omitted) (emphasis added); *see also* Pls.' Consol. Reply at 30; Defs.' Reply at 11 (parties agree that rational basis review is appropriate in this context).  This standard of review – i.e., rational basis review – is a "paradigm of judicial restraint," *id.*, so that where there are "plausible reasons for Congress' action," the court's inquiry must be "at an end," *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980); *see also BellSouth Corp. v. Fed. Commc'ns Comm'n*, 162 F.3d 678, 691 (D.C. Cir. 1998) (same); *Schweiker v. Wilson*, 450 U.S. 221, 230, 101 S.Ct. 1074, 67 L.Ed.2d 186 (1981) (a court's inquiry is limited to asking whether "the

legislation classif[ies] the persons it affects in a manner rationally related to legitimate government objectives"). In this arena, government actions bears "a strong presumption of validity" and the party challenging it "ha[s] the burden 'to negative *every conceivable basis* which might support it.'" *Beach Commc'ns*, 508 U.S. at 314-15, 113 S.Ct. 2096 (citations omitted) (emphasis added). That is, so long as the reviewing court can conceive of facts which reasonably justify the classification at issue, governmental action survives rational basis review. *Id.* at 315, 113 S.Ct. 2096.

Such deference is afforded the government because "'the legislature must necessarily engage in a process of line-drawing.'" *BellSouth Corp.*, 162 F.3d at 692 (quoting *Fritz*, 449 U.S. at 179, 101 S.Ct. 453). "Defining the class of persons subject to a regulatory requirement – much like classifying governmental beneficiaries – 'inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line, and the fact [that] the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration.'" *Beach Commc'ns*, 508 U.S. at 315, 113 S.Ct. 2096 (quoting *Fritz*, 449 U.S. at 179, 101 S.Ct. 453); *see also Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 365, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973) ("Only by faithful adherence to this guiding principle of judicial review of legislation is it possible to preserve to the legislative branch its rightful independence and ability to function.") (citation omitted).

2.      Plaintiffs' Preliminary Arguments

Before proceeding to a rational basis analysis of the 1998 revision, as adopted in the 2001/2002 CLDAP, it is important to note that Plaintiffs proactively emphasize two arguments in an attempt to undermine Defendants' ability to defend the revision at issue against an Equal Protection challenge. First, Plaintiffs continually stress what they deem to be "Congressional

silence" with respect to the 1998 revision.  According to Plaintiffs, "[t]he agency's failure to undertake notice and comment rulemaking, and its failure to inform any farmer of the changes it had made, and the noticeable absence of any Congressional statement in the appropriations bills regarding organic farmers or their rights under the disaster program, leaves this Court with nothing but silence" that seriously undermines any asserted, *post-hoc* rational basis.  Pls.' Mot. for Summ. J. at 10.  Second, Plaintiffs assert that the *post-hoc* bases offered by the Deputy Administrator for the FDA's Farm Programs, *see* Johnson Decl. ¶ 11, appear "nowhere" in the administrative record and should be stricken from consideration in the context of rational basis review.  *See* Pls.' Consol. Reply at 31 & n.10; Pls.' Mot. to Strike Johnson Decl.  Each argument is wholly without merit.

First, with respect to Plaintiffs' assertion of "Congressional silence," it is not correct that Congress at the time of the 1999 Appropriations Act – which laid the groundwork for the 1998 revision which clarified and/or altered the disaster relief provided to organic farmers – was wholly silent as to its intent.  Rather, Congress specifically directed that the Secretary of Agriculture distribute the disaster relief in a "fair and equitable manner," 1999 Appropriations Act § 1101(a), 112 Stat. at 2681-42, empowered the Secretary to determine "eligibility and payment limitation criteria," *id*. § 1101(b)(3), 112 Stat. at 2681-42, and instructed the Secretary "as appropriate" to issue "such regulations as are necessary" "*[a]s soon as practicable* after the date of enactment," *id*. § 1133(a), 112 Stat. at 2681-47 (emphasis added).  As such, it is clear that Congress set forth "broad criteria to distribute the limited funds available." *McDaniels v. United States*, 300 F.3d 407, 411 (4th Cir. 2002).  Indeed, the Fourth Circuit, upon construing the legislative history of the 1999 Appropriations Act, emphasized not confusing "silence" but rather clear instruction from Congress, finding that "we cannot imagine how Congress could have been more clear in its delegation of authority to the Secretary." *Id*.

Moreover, once the 1998 revision was enacted by the Secretary through the authority granted to him in the 1999 Appropriations Act, Congress repeatedly ratified the Secretary's conduct of the 1998 crop year program in subsequent years. *See, e.g.*, Pub. L. No. 106-78, 113 Stat. 1135, 1175, Title VII § 801(b) (1999) (directing that "[t]he Secretary shall make [disaster] assistance available under this section in the same manner as provided" under the 1998 CLDAP); Pub. L. No. 106-387, 114 Stat. 1549, 1549A-55, Title VII § 815(b)(1) (directing that "the Secretary shall make assistance available under this section in the same manner as provided under" the 1998 CLDAP). Here, it is uncontested that Plaintiffs sought disaster relief pursuant to the 2001/2002 CLDAP; once again, Congress was not silent on the Secretary's administration of the program, but instead directed conformity. That is, Congress explicitly told the Secretary to "make assistance available under this section *in the same manner* as provided under" the 2000 CLDAP. Pub. L. No. 108-7, 117 Stat. 11, 538, § 202(b)(2) (emphasis added). And it is undisputed that the 2000 CLDAP was administered with the 1998 revision in place, i.e., with equal treatment for all producers regardless of their cultivation methods. *See* 7 C.F.R. § 1480.12(c) (2002). Accordingly, to the extent that Plaintiffs somehow seek to rely on Congressional silence as probative of an illegitimate classification or an "unreasoned" basis or bases, Plaintiffs' argument is misplaced – here, while Congress' voice was certainly not deafening, it was far from mute.

Second, Plaintiff's *post-hoc* objections to Johnson's Declaration and other extra-record consideration are misplaced in the context of Equal Protection/rational basis review. As noted above, under rational basis review, the party attacking the rationality of the classification has the burden to negate every *conceivable* basis which might support it – not simply the articulated basis or bases for a policy. *See Beach Commc'ns*, 508 U.S. at 315 (citing cases). As the Supreme Court has stressed, "because we never require a legislature to articulate its reasons for enacting a statute, it

24

is entirely irrelevant for constitutional purposes whether the *conceived* reason for the challenged distinction actually motivated the legislature." *Id.* (citing *Fritz*, 449 U.S. at 179, 101 S.Ct. 453; *Flemming v. Nestor*, 363 U.S. 603, 612, 80 S.Ct. 1367, 1373, 4 L.Ed.2d 1435 (1960)).  Indeed, the absence of "legislative facts" explaining the distinction "on the record" "has no significance in rational-basis analysis." *Id.* (citations omitted); *see also Nordlinger v. Hahn*, 505 U.S. 1, 15, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992) (equal protection "does not demand for purposes of rational-basis review that a legislative or governing decisionmaker actually articulate at any time the purpose or rationale supporting its classification").  Because rational basis review allows the Court to look at any "conceivable" justification for the treatment of Plaintiffs under the 1998 revision, as re-enacted by the 2001/2002 CLDAP, the Court can certainly look to the *post-hoc* justifications forwarded by Deputy Administrator Johnson in his Declaration.  Moreover, the Supreme Court has also stressed that because "a legislative choice is not subject to courtroom fact-finding," a legislative distinction may even "be based on rational speculation unsupported by evidence or empirical data." *Beach Commc'ns*, 508 U.S. at 315 (citing *Vance v. Bradley*, 440 U.S. 93, 111, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979); *Minn. v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981)).  That is, the court itself may look to any "common-sense" possibilities not argued by the government. *See Bradley*, 440 U.S. at 111-12, 99 S.Ct. 939.  Given the deferential standard pursuant to rational basis review, and the directive that a court look to any "conceivable" justification, Plaintiffs' *post-hoc* arguments and Motion to Strike the Johnson Declaration have no traction in the context of their Equal Protection claims.  Rather, the Court can – and shall – consider Congressional intent, articulated bases, and possible other bases behind the 1998 revision (and its subsequent re-adoption in subsequent years) when analyzing Plaintiffs' Equal Protection challenge.

3.      The 1998 Revision, as Re-Adopted by the 2001/2002 CLDAP, Survives
        Rational Basis Scrutiny

As set forth in the Johnson Declaration and emphasized by Defendants in their briefs, *see,*

*e.g.*, Defs.' Cross-Mot. for Summ. J. at 13-15; Defs.' Reply at 12-13 & n.8-9, the USDA claims at

least four separate "bases" underpinning "[t]he Secretary's decision not to pay special rates for

special cultivation practices."  *See* Johnson Decl. ¶ 11.  In short, Defendants' arguments may be

summarized accordingly:

1.      Speed: Speed is a critical factor in disaster assistance programs.  Indeed, the 1998
        revision arose out of a program – the 1999 Appropriations Act – that was intended to
        quickly provide farmers with basic, emergency financial relief for damaged crops.
        *See* Pub. L. No. 105-277, 112 Stat. 2681, at § 824(a) (directing the Secretary to
        provide disaster assistance "as soon as practicable"); *id.* § 1133 (exempting the
        Secretary's regulations from APA requirements); *see also McDaniels*, 300 F.3d at
        408-09 (discussing the 1998 CLDAP).  According to Deputy Administrator
        Johnson, "verifying disaster assistance payments based on a farmer's asserted use of
        particular cultivation methods would require increased individualized determinations
        and verification, adding greatly to the program's administrative burden and slowing
        it down while sapping disproportionate resources" – a problem that would be
        exacerbated given that the resources for the 1998 program came from "a limited,
        lump-sum appropriation."  Johnson Decl. ¶ 11(A).

2.      Difficult Determinations: According to Deputy Administrator Johnson, "[i]t would
        also have been extremely difficult to determine what crops were, indeed, produced
        with a particular cultivation method."  *Id.* ¶ 11(B).  Indeed, given that Plaintiffs
        suffered crop losses for the crop year 2001, it would have been especially difficult to
        determine who was an organic producer, what crops were organic, or what it even
        meant to be "organic" because both the 1998 revision and the 2001/2002 CLDAP
        preceded the enactment of the Organic Foods Product Act and the National Organic
        Program under which the USDA established a certification program for organic
        producers and products in 2002.  *Id.*

3.      No Reliable Data: As Deputy Administrator Johnson claims, "there was no reliable
        price and yield data for organic crops in 1998 on which the FSA could have based
        fair, reliable grants of disaster assistance."  *Id.* ¶ 11(C).

4.      Fairness: According to Deputy Administrator Johnson, "[t]he Secretary designed the
        program to treat all producers fairly and equally, regardless of their cultural
        practices, because it was intended simply to provide basic, emergency benefits to
        farmers whose crops are damaged due to disaster."  *Id.* ¶ 11(D).  That is, "[u]nlike

26

certain other USDA programs, the disaster program was not intended to regulate
producers' behavior or to encourage certain cultural practices over others, even if the
market rewards those practices."  *Id.*

In response to the *post-hoc* bases proffered by Deputy Administrator Johnson and adopted
by Defendants in this action, Plaintiffs attempt to highlight what they allege to be the errors
underlying Defendants' reasoning.  *See* Pls.' Consol. Reply at 31-39.  As such, Plaintiffs attack the
justifications offered by Defendants in the following manner:

1.  Speed: According to Plaintiffs, "[e]very disaster application is filed [sic] by an
individual eligible producer involves factual assessments particular to that
applicant."  *Id.* at 32 (citing 7 C.F.R. § 1480.4 (Producer Eligibility)).  As such,
"[a]n organic farmer poses nothing unique in this regard."  *Id.*  Plaintiffs point out
that "[a] mere glance at the 2002 rules and the Secretary's Handbook for the disaster
program demonstrates that there are far more complicated individual calculations
made than determining whether a farmer is a certified organic farmer or not."  *Id.*

2.  Difficult Determinations: Plaintiffs point out that although the National Organic
Program was not established by the USDA until 2002, twelve years *after* the
Organic Foods Production Act was actually passed by Congress, the individual states
had been certifying farmers as "organic" for many years prior – since the 1980s in
some cases.  *Id.* at 33.  Indeed, Plaintiff Pringle was found to have been certified in
Michigan since 1991, *see* Pringle A.R. at 85, 142, and Plaintiff Partlo had sales
records going back to 1996 establishing the same level of traceability and
verification of his crops and practices, *see* Partlo A.R. at 113-148.  Plaintiffs
emphasize that the prior state certification programs were similar to state drivers'
licenses:  while the qualifications for obtaining drivers' licenses may vary in each
state, the licenses still may be used for identification in states other than the home
states.  *See* Pls.' Consol. Reply at 33.

3.  No Reliable Data: Plaintiffs contest Defendants' assertion, embodied in the Johnson
Declaration, that no reliable data was available in 1999, or 2001, for organic crop
pricing.  *See id.* at 35-37.  Essentially, Plaintiffs point out that:  (1) the *Pringle* and
*Seibel* cases recognized such data; (2) the National Agricultural Statistics Service's
("NASS") "2002 Census of Agriculture" contained organic market data for each
state, including the years 1997-2002; (3) and "end market" information was clearly
available in this case, as seen through the significant amount of data provided in the
Administrative Record.

4.  Fairness: Plaintiffs contest Deputy Administrator Johnson's "fairness" argument in
two ways: (1) Plaintiffs stress that their product is worth more in the "end market,"
and therefore fairness dictates that they should be compensated at a higher rate in

disaster relief, *id.* at 37; and (2) Plaintiffs argue that "Congress unambiguously created a separate organic marketplace with the OFPA and the USDA has implemented detailed rules to ensure that organic products are distinctly produced, handled and labeled," *id.* at 31 – i.e., because there are distinctions between organic and conventional farming in other areas, fairness dictates that those distinctions carry over into the disaster relief arena.

While many of Plaintiffs' arguments may contain an element of truth and a degree of persuasiveness, Plaintiffs' Equal Protection argument ultimately flounders for three central reasons.

First, Plaintiffs' arguments venture into the dangerous territory of essentially asking that a court overturn a policy decision of both Congress and an agency because it disagrees with the practical policy ramifications of certain scope-of-coverage provisions. *See Bradley*, 440 U.S. at 111, 99 S.Ct. 939 ("'The District Court's responsibility for making 'findings of fact' certainly does not authorize it to resolve conflicts in evidence against the legislature's conclusion or even to reject the legislative judgment on the basis that without convincing statistics in the record to support it, the legislative viewpoint constitutes nothing more than what the District Court in this case said was 'pure speculation.'") (quoting *Bhd. of Locomotive Firemen & Enginemen v. Chicago, R. I. & P.R. Co.*, 393 U.S. 129, 138-39, 89 S.Ct. 323, 21 L.Ed.2d 289 (1968)).  If this Court were to follow Plaintiffs' gambit, it would venture well beyond the "paradigm of judicial restraint" emphasized by the Supreme Court. *See Beach Commc'ns*, 508 U.S. at 314, 113 S.Ct. 2096.

Indeed, "[s]uch scope-of-coverage provisions are unavoidable components of most economic or social legislation." *Id.* at 316, 113 S.Ct. 2096.  Such line-drawing is generally best left to the legislature and agencies granted discretion by that legislature. *See Fritz*, 449 U.S. at 461, 101 S.Ct. 453 ("the fact the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration"); *Bradley*, 440 U.S. at 112, 99 S.Ct. 939 ("'It makes no difference that the facts may be disputed or their effect opposed by argument and opinion of serious

28

strength.  It is not within the competency of courts to arbitrate in such contrariety.'") (quoting *Rast v. Van Deman & Lewis Co.*, 240 U.S. 342, 357, 36 S.Ct. 370, 60 L.Ed.2d 679 (1916)).  As Justice William O. Douglas pointed out:

> The problem of legislative classification is a perennial one, admitting of no doctrinaire definition.  Evils in the same field may be of different dimensions and proportions, requiring different remedies.  Or so the legislature may think.  Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.  The legislature may select one phase of one field and apply a remedy there, neglecting others.  The prohibition of the Equal Protection Clause goes no further than invidious discrimination.

*Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563 (1955) (citations omitted).  Here, despite unproven murmurings by Plaintiffs of some form of "animus" against organic farmers in the USDA, Plaintiffs have done no more than suggest that they want more disaster benefits than the relief – pegged to conventional farming – provided.  While the Court might well sympathize with such a position, such inequality in disaster relief simply does not arise out of the kind of classification that runs afoul of the Equal Protection Clause.  *See, e.g.*, *Beach Commc'ns*, 508 U.S. at 316 n.7, 113 S.Ct. 2096; *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970) (classification does not violate equal protection simply because it "is not made with mathematical nicety or because in practice it results in some inequality") (internal quotation marks omitted); *Metropolis Theatre Co. v. Chicago*, 228 U.S. 61, 69-70, 33 S.Ct. 441, 57 L.Ed. 730 (1913) ("The problems of government are practical ones and may justify, if they do not require, rough accommodations – illogical, it may be, and unscientific"); *Heath & Milligan Mfg. Co. v. Worst*, 207 U.S. 338, 354, 28 S.Ct. 114, 52 L.Ed. 236 (1907) ("logical appropriateness of the inclusion or exclusion of objects or persons" and "exact wisdom and nice adaption of remedies are not required").

Second, it is clear that at least some of the rationales behind the 1998 revision (and its subsequent re-adoptions) forwarded by Deputy Administrator Johnson and Defendants could have "reasonably be conceived to be true by the governmental decisionmaker" and motivated a rational governmental actor. *See Bradley*, 440 U.S. at 111, 99 S.Ct. 939. For instance, administrative efficiency is plainly a rational basis. *See Women Involved in Farm Economics ("WIFE") v. U.S. Dep't of Agric.*, 876 F.2d 994, 1002 (D.C. Cir. 1989); *cf. Califano v. Jobst*, 434 U.S. 47, 53, 98 S.Ct. 95, 54 L.Ed.2d 228 (1977) (general rules are essential to administrative efficiency even though they inevitably produce seemingly arbitrary consequences in some individual cases). Plaintiffs, in their Consolidated Reply, confusingly argue that there would be no *additional* administrative burden in differentiating between organic and conventional/chemical farmers, because under the CLDAP the agency already bears some administrative burden. *See* Pls.' Consol. Reply at 32-33. Obviously, *adding* any burden means there is an *additional* burden, regardless of how much burden there was *ex ante*; avoiding such additional burden, and thereby increasing the program's speed and efficiency, is a rational purpose. *See WIFE*, 876 F.2d at 1002. Moreover, provision of basic, emergency benefits – rather than rewarding certain individualized farming practices – is fully consistent with the purpose of the CLDAPs: i.e., to quickly fund "urgent needs on an emergency basis." Signing Statement of President William J. Clinton, 1998 U.S.C.C.A.N. 576, 579; *see also McDaniels*, 300 F.3d at 408-09 (discussing 1998 CLDAP and its purposes).

Third, while not focused on by the parties (though possibly covered by Defendants' "fairness" argument), there are clearly other possible "rational bases" for not distinguishing between organic and conventional/chemical farmers in the provision of disaster relief. *Cf. Beach Commc'ns*, 508 U.S. at 315, 113 S.Ct. 2096 ("those attacking the rationality of the legislative classification

30

have the burden to negative every conceivable basis which might support it") (citations and internal quotation marks omitted).  It is undisputed that the 2001/2002 CLDAP – the applicable crop loss program for Plaintiffs' losses – arose in a setting where funding was quite limited, and producers had to jump through several hoops to garner relief.  *See* 7 C.F.R. § 1480.11(a); *id.* § 1480.5; *see also supra* Section I(A)(6).  Indeed, all producers – whether organic or conventional farmers – were competing for limited relief, and could only be compensated for losses suffered in one of the two crop years, not both.  *Id.*  Two rational goals could possibly be promoted through the 2001/2002 CLDAP, which incorporates the 1998 revision, that would otherwise be undermined if the Secretary followed Plaintiffs' argument and provided a sliding scale of disaster relief based on cultivation practices:  (1) greater scope of relief; and (2) the (probable) minimization of risky behavior that would otherwise lead to increased program costs borne by society.

The first idea is simple:  with limited disaster relief available, paying disaster relief to all farmers irrespective of cultivation practices would allow more farmers to receive aid.  In contrast, the evidence is clear that organic crops have a higher value at market; if that value was recognized through higher disaster relief rates, there would be less money available to compensate all farmers for their disaster-related losses than would otherwise be available if the current system was in place.  As such, it is possible that such a distinction could jeopardize the ability of some farmers to recover relief, given that the fund is limited.  Accordingly, a rational policymaker might well choose "increased farmer coverage" over "ensuring crop relief reflects the market value of those crops."  Indeed, this is the archetypal policy consideration best left to the elected legislature and/or agency with delegated authority and expertise rather than the judiciary.

The second idea, which focuses on incentives and disincentives created by the parameters of disaster relief (which is essentially a form of insurance), is a bit more complex.  It *may* be logical for

31

a rational policymaker to assume that organic crops – which require, *inter alia*, both more intensive

care and labor <u>and</u> use of specialized equipment and other substitutes for synthetic chemicals[6] – face

a higher risk of failure due to disaster than conventional/chemical crops, as conventional farming

uses a variety of pesticides and sprays to repel pests and provide other protection.  *See, e.g.*,

Catherine R. Greene, *U.S. Organic Farming Emerges in the 1990s: Adoption of Certified*

*Systems*, U.S. Dep't of Agric., Econ. Research Serv., Resource Econ. Div., Agric. Info. Bulletin No.

770, at 2 (June 2001) ("Some of the cultural, biological, and mechanical practices used in organic

systems may be more expensive, *less effective*, or more management-intensive than use of chemical

fertilizers and pesticides . . . .") (emphasis added); *cf. Hughes v. Alexandria Scrap Corp.*, 426 U.S.

794, 812, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976) ("The State is not compelled to verify logical

assumptions with statistical evidence.").  Indeed, such a danger has apparently sadly become a

reality for Plaintiff Pringle, who – as evidenced in his various legal actions – has experienced

significant organic crop failure repeatedly in numerous recent years.  Therefore, it could be

reasonable for a rational policymaker to assume that creating an economic distinction between

conventional farmers and organic farmers in the disaster relief arena would mean that more farmers

have an incentive to take up organic farming, where they would have an increased upside (higher

prices at market) while facing no significant downside (given that they would receive higher rates of

disaster relief) despite the possible greater risk and higher cost to the system involved.  As such, with

farmers competing for disaster relief out of a limited fund, a rational policymaker granted wide

discretion by Congress – such as the Secretary in this case – may well conclude that while the

---

[6] *See Seibel*, NAD Log No. 95001879W at 3; Lydia Oberholtzer, Carolyn Dimitri, & Catherine Greene, *Price Premiums Hold on as U.S. Organic Produce Market Expands*, U.S. Dep't Of Agric., Econ. Research Serv., VGS-308-01, at 6 (May 2005).

marketplace may legitimately reward organic farming in the form of higher prices upon sale, it would be illogical to reward organic farming with higher disaster relief rates, because providing organic farmers with a higher rate of assistance would induce and motivate what might rationally be described as a somewhat "risky" and "costly" behavior over a less "risky" cultural practice (i.e., conventional/chemical farming).

Ultimately, upon an examination of the totality of these considerations, it is clear that Plaintiffs' Equal Protection argument lacks merit.  Here, (1) Plaintiffs have failed to establish any animus against organic farmers as a class, or any invidious discrimination arising from a program that treats all farmers equally with respect to disaster relief; (2) the area at issue is ultimately a question of economic policy best left to Congress and agencies such as the USDA with clear delegated authority, expertise, and discretion; and (3) several rational considerations underpin the current program, such as administrative efficiency, the need to quickly provide urgent relief, a desire to cover the most farmers possible, and a policy decision *not* to create incentives for farmers to engage in riskier, more costly cultivation practices for which society – rather than the individual farmer – would have to bear a greater portion of the risk.  Accordingly, the Court shall deny Plaintiffs' Motion for Summary Judgment as it relates to Plaintiffs' Equal Protection claims, and grant Defendants' Cross-Motion for Summary Judgment as it relates to those claims.

B.      *Plaintiffs' APA Claim(s)*

In addition to Plaintiffs' Equal Protection claims, Plaintiffs have also alleged that the 1998 revision, as re-adopted and re-incorporated into the 2001/2002 CLDAP, is "arbitrary and capricious" in violation of the APA.  According to Plaintiffs, the 1998 revision "is arbitrary and capricious because the USDA has not produced any record of the decision-making process which led to the [1998 revision], let alone one demonstrating that it 'examine[d] the relevant data' and drew a

33

'rational connection between the facts found and choice made.'" Pls.' Mot. for Summ. J. at 11

(quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct.

2856, 77 L.Ed.2d 443 (1983)).  Plaintiffs contend that the 1998 revision, as incorporated into the

2001/2002 CLDAP, "should be set aside because in creating and applying it the USDA did not

consider the relevant factors, examine the relevant data, or 'articulate a satisfactory explanation for

its action including a rational connection between the facts found and choice made.'" *Id.* at 11-12.

Moreover, Plaintiffs assert that the 2001/2002 CLDAP, by providing no distinction in disaster relief

based on cultivation practices, lacks a reasoned basis that flies in the face of the distinctions

recognized by Congress in enacting the OFPA in 1990 and the subsequent decisions in *Seibel* and

*Pringle*.

In examining Plaintiffs' APA claim(s), the Court shall progress through its analysis in

several increments.  First, an articulation of the applicable standards guiding a court's decision

under the APA is necessary.  Second, before proceeding to Plaintiffs' APA claim, it will be essential

to resolve one key issue:  the propriety of considering Deputy Administrator Johnson's admittedly

*post-hoc* declaration.  Indeed, this argument is the focus of Plaintiffs' Motion to Strike or

Alternatively, to File Rebuttal Declarations, and brings in a different set of considerations vis-á-vis

the Johnson Declaration than were applicable in the context of Plaintiffs' Equal Protection claim

given the more limited scope of APA review.  Third, and finally, the Court shall move to a

consideration of Plaintiffs' APA-related claims on their merits.  Upon a reasoned, logical

progression through these steps, the Court concludes that Plaintiffs' APA claims are without

foundation, and that summary judgment in favor of Defendants with respect to these claims is

appropriate.

1.      Relevant Standards for Administrative Agency Review under the APA

Plaintiffs in this case challenge the USDA's 1998 revision, which was effectuated pursuant

to an explicit grant of discretion by Congress and re-adopted by both Congress and the agency in

subsequent years.  The standard for the Court's review of such challenges is known as *Chevron*

review, after the Supreme Court's decision in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council*,

467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).  The central question for the reviewing

court under *Chevron* "is whether the agency's construction of the statute is faithful to its plain

meaning, or, if the statute has no plain meaning, whether the agency's interpretation 'is based on a

permissible construction of the statute.'"  *Arent v. Shalala*, 70 F.3d 610, 615 (D.C. Cir. 1995)

(quoting *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778).  Under the *Chevron* analysis, a court first asks

"whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is

clear, that is the end of the matter; for the court, as well as the agency, must give effect to the

unambiguously expressed intent of Congress."  *Chevron*, 467 U.S. at 842-43, 104 S.Ct. 2778; *see*

*also id*. at 843 n.9, 104 S.Ct. 2778 ("[A]dministrative constructions which are contrary to clear

congressional intent" must be rejected by the court).  "When performing this first step, [courts]

employ traditional tools of statutory construction."  *Indep. Ins. Agents of Am., Inc. v. Hawke*, 211

F.3d 638, 643 (D.C. Cir. 2000) (citing *Chevron*, 467 U.S. at 842-43, 104 S.Ct. 2778; *INS v.*

*Cardoza-Fonseca*, 480 U.S. 421, 446, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)).  Among these

tools is a statute's legislative history.  *See Am. Fed'n of Labor & Congress of Indus. Orgs. v. Fed.*

*Election Comm'n*, 333 F.3d 168, 172 (D.C. Cir. 2003) ("*AFL-CIO*"); *Am. Bankers Ass'n v. Nat'l*

*Credit Union Admin.*, 38 F. Supp. 2d 114, 134 (D.D.C. 1999); *see also Nat. Res. Def. Council v.*

*Browner*, 57 F.3d 1122, 1127 (D.C. Cir. 1995) ("Reference to statutory design and pertinent

legislative history may often shed new light on congressional intent, notwithstanding statutory language that appears 'superficially clear.'") (quoting *Am. Scholastic TV Programming Found. v. Fed. Commc'ns Comm'n*, 46 F.3d 1173, 1178 (D.C. Cir. 1995)).  However, canons of construction are only to be used during step one of the *Chevron* analysis to determine if "Congress had a *specific* intent on the issue in question."  *Mich. Citizens for an Indep. Press v. Thornburgh*, 868 F.2d 1285, 1292-93 (D.C. Cir. 1989) (emphasis in original).  In conducting this stage of the *Chevron* analysis, the Court "giv[es] no deference to the agency's interpretation."  *AFL-CIO*, 333 F.3d at 173.

If the court finds that "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."  *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778.  "A statute is considered ambiguous if it can be read more than one way."  *AFL-CIO*, 333 F.3d at 173.  "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding."  *Chevron*, 467 U.S. at 843 n.11, 104 S.Ct. 2778.  Therefore

> [w]hen a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail.  In such a case, federal judges – who have no constituency – have a duty to respect legitimate policy choices made by those who do.  The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones:  "Our Constitution vests such responsibilities in the political branches."

*Id*. at 866, 104 S.Ct. 2778 (quoting *TVA v. Hill*, 437 U.S. 153, 195, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978)).  However, if the Agency's interpretation unduly compromises the statute's "purposes, it is not a 'reasonable accommodation' under the Act, and it would therefore not be entitled to deference."  *Orloski v. Fed. Election Comm'n*, 795 F.2d 156, 164 (D.C. Cir. 1986) (quoting

*Chevron*, 467 U.S. at 845, 104 S.Ct. 2778); *see also Chevron*, 467 U.S. at 845, 104 S.Ct. 2778

(providing that if the agency's "choice represents a reasonable accommodation of conflicting

policies that were committed to the agency's care by the statute, we should not disturb it unless it

appears from the statute or its legislative history that the accommodation is not one that Congress

would have sanctioned.") (quoting *United States v. Shimer*, 367 U.S. 374, 382, 81 S.Ct. 1554, 6

L.Ed.2d 908 (1961)); *Common Cause v. Fed. Election Comm'n*, 692 F. Supp. 1391, 1396 (D.D.C.

1987) ("[W]here the agency interprets its statute in a way that flatly contradicts Congress's express

purpose, the court may – indeed must – intervene and correct the agency.").

In addition to their basic *Chevron* challenge, Plaintiffs also contend that the USDA abused

its discretion in an "arbitrary and capricious" manner in failing to provide a "reasoned basis"

underlying its refusal to provide different disaster relief rates for different cultivation practices,

despite their different values at market.  According to Plaintiffs, the USDA essentially treated

dissimilar farmers similarly, to the detriment of organic farmers such as Plaintiffs.  The

Administrative Procedure Act ("APA") provides that "[t]he reviewing court shall . . . hold unlawful

and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

> The scope of review under the "arbitrary and capricious" standard is narrow and a court
> is not to substitute its judgment for that of the agency.  Nevertheless, the agency must
> examine the relevant data and articulate a satisfactory explanation for its action
> including a rational connection between the facts found and the choice made.  In
> reviewing that explanation, we must consider whether the decision was based on a
> consideration of the relevant factors and whether there has been a clear error of
> judgment.  Normally, an agency rule would be arbitrary and capricious if the agency
> has relied on factors which Congress has not intended it to consider, entirely failed to
> consider an important aspect of the problem, offered an explanation for its decision that
> runs counter to the evidence before the agency, or is so implausible that it could not be
> ascribed to a difference in view or the product of agency expertise. The reviewing court
> should not attempt itself to make up for such deficiencies:  We may not supply a
> reasoned basis for the agency's action that the agency itself has not given.  We will,

however, uphold a decision of less than ideal clarity if the agency's path may reasonably
be discerned.

*Motor Vehicle Mfrs. Ass'n of the United States, Inc.*, 463 U.S. at 43, 103 S.Ct. 2856 (internal

citations and quotation marks omitted); *see also Cellco P'ship v. Fed. Commc'ns Comm'n*, 357

F.3d 88, 93-94 (D.C. Cir. 2004) (noting "arbitrary and capricious" review is "highly deferential . . .

presum[ing] the validity of agency action . . . [which] must [be] affirm[ed] unless the Commission

failed to consider relevant factors or made a clear error in judgment."). The "reasoned analysis"

requirement is "not 'particularly demanding,'" and "is satisfied if the agency 'enables us to see what

major issues of policy were ventilated and why the agency reacted to them as it did.'" *Republican*

*Nat'l Comm. v. Fed. Election Comm'n*, 76 F.3d 400, 407 (D.C. Cir. 1996), *cert. denied*, 519 U.S.

1055, 117 S.Ct. 682, 136 L.Ed.2d 607 (1997) (quoting *Pub. Citizen, Inc. v. Fed. Aviation Admin.*,

988 F.2d 186, 197 (D.C. Cir. 1993) (internal punctuation omitted). Moreover, the Court "must

affirm if a rational basis for the agency's decision exists." *Bolden v. Blue Cross & Blue Shield*

*Ass'n*, 848 F.2d 201, 205 (D.C. Cir. 1988). The degree of deference a court should pay an

agency's construction is, however, affected by "the thoroughness, validity, and consistency of an

agency's reasoning." *Fed. Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454

U.S. 27, 37, 102 S.Ct. 38, 70 L.Ed.2d 23 (1981). Moreover, this Circuit has noted that "a

permissible statutory construction under *Chevron* is not always reasonable under *State Farm*: 'we

might determine that although not barred by statute, an agency's action is arbitrary and capricious

because the agency has not considered certain relevant factors or articulated any rationale for its

choice.'" *Republican Nat'l Comm.,* 76 F.3d at 407 (quoting *Arent*, 70 F.3d at 620 (Wald, J.,

concurring in the judgment)).

38

2.      The Propriety of the Johnson Declaration in the Context of APA Review

Plaintiffs object to the admittedly *post-hoc* declaration submitted by Deputy Administrator

Johnson and relied on by Defendants in response to Plaintiffs' APA challenges for four basic

reasons:  (1) APA review is typically limited to the administrative record before the court, *see* Pls.'

Mot. to Strike at 2; Pls.' Consol. Reply at 7-8; (2) the declarant (i.e., Johnson) was not involved in

the original adoption of the 1998 revision, Pls.' Mot. to Strike at 2-3; (3) supplementation of the

record is not authorized in these circumstances, *id*. at 5-6; and (4) the Johnson Declaration –

standing alone – skews the record and leaves out material information in possession of the agency,

*id*. at 6-9.  As such, Plaintiffs request that this Court either strike the Johnson Declaration, or permit

Plaintiffs to submit rebuttal declarations.  *Id*. at 9-11.  Each argument is flawed.

a.      The Asserted Limitations on APA Review

With respect to Plaintiffs' first argument, i.e., the inherent limitations in APA review, it is

certainly true that a "fundamental rule of administrative law" is that a court reviewing an agency's

decision "must judge the propriety of [agency] action solely by the grounds invoked by the agency."

*Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947).

Typically, the grounds reviewed appear in the administrative record, *see Cmty. for Creative Non-*

*Violence v. Lujan*, 908 F.2d 992, 997 (D.C. Cir. 1990), and review "is to be based on the full

administrative record that was before the [agency] at the time [it] made [its] decision," *Citizens to*

*Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

The reasons provided by the agency are the only bases on which the agency's actions may typically

be upheld, *see State Farm*, 463 U.S. at 50, 103 S.Ct. 2856 ("It is well-established that an agency's

action must be upheld, if at all, on the basis articulated by the agency itself."), and "it is the agency's

39

responsibility, not this Court's, to explain its decision," *id.* at 57; *see also Chenery Corp.*, 332 U.S. at 196, 67 S.Ct. 1575 ("If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis."). As such, the general rule is that the reviewing court may consider only the justifications for a rule advanced by the agency at the time the rule was promulgated; it may not consider *post-hoc* justifications. *See Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); *see also Edison Elec. Inst. v. OSHA*, 849 F.2d 611, 617-18 (D.C. Cir. 1988) ("Ordinarily, . . . neither party is entitled to supplement the record with litigation affidavits or other evidentiary material that was not before the agency.") (citations omitted); *Tovar v. U.S. Postal Serv.*, 3 F.3d 1271, 1279 n.15 (9th Cir. 1993) (same).

However, the 2001/2002 CLDAP rules (indeed, the rules for every CLDAP program since 1998) were properly promulgated without notice and comment or other contemporaneous explanation pursuant to express waivers of those requirements by Congress. *See, e.g.*, Pub. L. No. 108-7, 117 Stat. 11, 546-47, Division N § 217(b) (specifically exempting the 2001/2002 CLDAP regulations from "the notice and comment provisions of" 5 U.S.C. § 553, which include the requirement that the agency provide a "statement of [the regulation's] basis and purpose"); *cf. McDaniels*, 300 F.3d at 412 ("In the 1999 Appropriations Act, Congress authorized the Secretary to promulgate regulations without regard to the notice and comment requirements of the [APA]. Thus, the Secretary was not required to explain his reasoning.").

Where "the agency had no obligation to explain its actions contemporaneously, somewhat different considerations apply" that render the traditional rule – limiting APA review to the contemporaneous administrative record – inoperable. *WIFE*, 876 F.3d at 999. Indeed, in circumstances similar to the present, where the rule at issue was promulgated under an explicit

exception to the APA's publication requirements, *id.* at 998, this Circuit has stressed that "the entire record, or a good part of it, is actually created for the sole purpose of judicial review; by definition, much that is presented to the court is developed *post-hoc*," *id.* at 999. As the D.C. Circuit pointed out in *WIFE*, "[w]e are thus aware of no case in which the Supreme Court has applied *Chenery*'s proscription against crediting [*post-hoc*] explanations to the review of agency action exempt from the APA's requirement of a contemporaneous explanation of the action's basis or purpose." *Id.* (distinguishing, for instance, *State Farm*, 464 U.S. at 50, 103 S.Ct. 2856 (where the rulemaking at issue was subject to notice and comment procedures)); *see also Tovar*, 3 F.3d at 1279 n.15 (following *WIFE* for the proposition that in circumstances such as these, "[i]t is permissible . . . to rely on *post hoc* justifications for the rule"); *Gen. Servs. Admin. v. Fed. Labor Relations Auth.*, 86 F.3d 1185, 1188 (D.C. Cir. 1996) (following *WIFE*); *Fed. Labor Relations Auth. v. Dep't of Treasury*, 884 F.2d 1446, 1455 (D.C. Cir. 1989) (following *WIFE*), *cert. denied*, 493 U.S. 1055, 110 S.Ct. 864, 107 L.Ed.2d 948 (1990); *cf. McDaniels*, 300 F.3d at 414 (Luttig., J., dissenting) ("the proper approach . . . [is] for the agency itself to explain post hoc what the reasons for its action actually were").[7]

---

[7] The majority in *McDaniels* actually held that, in the context of the broad delegation of authority given to the USDA by Congress under the 1999 Appropriations Act (pursuant to which the 1998 revision in this case was promulgated), courts conducting an APA review essentially craft a "reasonable basis" analysis where they themselves can spontaneously craft *post-hoc* agency explanations that satisfy the APA's "arbitrary and capricious" test. *See McDaniels*, 300 F.3d at 412-13 & n.2. This Court, like Judge J. Michael Luttig in his dissent, believes that in the context of APA review (as opposed to Equal Protection review), "'[a]gency deference has not come so far that we [the Supreme Court] will uphold regulations whenever it is possible to 'conceive a basis' for administrative action.'" *Id.* at 415 (Luttig, J., dissenting) (quoting *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626, 106 S.Ct. 2101, 90 L.Ed.2d 584 (1986) (plurality opinion)). Indeed, the D.C. Circuit in *WIFE* and subsequent cases has refused to go as far as suggested by the *McDaniels* majority and has always required at least some form of *post-hoc* statement by the agency or its counsel in the context of APA review. *See Fed. Labor Relations Auth.*, 884 F.2d at 1455 ("judicial

Given the clear exemption provided by Congress with respect to both the 1998 revision and the 2001/2002 CLDAP at issue in this case, as well as the post-*WIFE* line of cases in this Circuit, it is plain that Plaintiffs' objection to the Johnson Declaration, based on the fact that the declaration and the reasoning therein were *post-hoc*, is without foundation.

        b.     The Assertion that the Declarant Was "Uninvolved" With the Decision-Making Process

Plaintiffs' second objection to the introduction and consideration of the Johnson Declaration is that Deputy Administrator Johnson has held his position at the USDA only since 2002, *see* Johnson Decl. ¶ 1, whereas the rule at issue was originally promulgated in 1998, when Johnson was serving "as the State Executive Director ('SED') for FSA in Virginia," *id.  See also* Pls.' Mot. to Strike at 2-3.  As such, Plaintiffs claim that Johnson is an incompetent declarant.  *Id.*  Two problems undermine Plaintiffs' objection.

First, Plaintiffs in this case suffered crop losses in the crop year 2001, and were therefore affected by the 2001/2002 CLDAP.  The 2001/2002 CLDAP was promulgated pursuant to a Consolidated Appropriations Resolution passed by Congress on February 20, 2003, *see* Pub. L. No. 108-7, 117 Stat. 11, 538, Division N § 202 (2003), while the rules and regulations rejecting differentials in disaster relief rates based on cultivation practices (i.e., continuing the 1998 revision) were not put forth by the USDA until June 26, 2003, *see* 68 Fed. Reg. 37936 (June 26, 2003), codified at 7 C.F.R. § 1480 (2004).  Because Johnson has been serving as Deputy Administrator since 2002, Johnson was actually present at the USDA during the time period relevant to this suit,

---

affirmance on a basis never articulated by the agency could thus produce an unintended result and usurp the agency's function").  As such, at least based on the present state of the law, this Court must agree with Judge Luttig that – under APA review – "it is unacceptable for a court to generate its own reasons for agency action, as it is to substitute its own views for those of the agency as to the propriety of particular action."  *McDaniels*, 300 F.3d at 415 (Luttig., J., dissenting).

wherein Congress directed that the Secretary follow the 2000 CLDAP (and therefore, the 1998

CLDAP containing the 1998 revision) and the Secretary followed it accordingly.  As such, to the

extent that Plaintiffs assert that "[t]he declarant was not involved in the adoption of the challenged

rule," *see* Pls.' Mot. to Strike at 2-3, Plaintiffs' objection is simply factually erroneous.

Second, to the extent that Plaintiffs suggest that the competency of a declarant is dependent

on his or her involvement with the <u>original</u> adoption of the rule at issue in a case such as this one,

Plaintiffs are also in error.  *See* Pls.' Mot. to Strike at 2-3 (claiming that "this Circuit's cases require

that an agency official that personally directed the policy action at issue provide the *post hoc* agency

rationale missing in the original record").  Here, in the 1999 Appropriations Act, which led to the

original 1998 revision, Congress (1) granted the Secretary broad discretion to implement the 1998

CLDAP, and exempted the USDA's ultimate regulations from the notice-and-comment requirements

of 5 U.S.C. § 553 and the State of Policy of the Secretary of Agriculture effective July 24, 1971, *see*

36 Fed. Reg. 13804; and (2) did not require that the Secretary, or any other USDA official, make

contemporaneous findings to justify the ensuing rules and regulations.  *But cf. Sugar Cane Growers*

*Coop. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002) (holding that where notice and comment rule

making was required under the Food Security Act of 1985, the Secretary – and no other official –

had to make certain findings pursuant to 7 U.S.C. § 1308a, and the statute explicitly limited this

power to the Secretary only, no other official was competent to submit a declaration).  In situations

such as these, where *post-hoc* rationales may be offered by the government due to Congress' explicit

waiver of an agency's Section 553 obligations, the D.C. Circuit has – on frequent occasion – relied

on the *post-hoc* representations of an agency's counsel, rather than requiring some form of affidavit

from an agency official.  *See, e.g.*, *WIFE*, 876 F.2d at 998 ("We think that the district court was, as

are we, entitled to rely on counsel's explanations without seeking a supporting affidavit from the

Secretary."); *Fed. Labor Relations Auth.*, 884 F.2d at 1455-56 (adopting the litigation positions

taken by *amicus curie* where those positions where ultimately "explicitly adopted" by agency

official); *Gen. Servs. Admin.*, 86 F.3d at 1188 ("We have even deferred to 'agency counsel's

litigative positions' where we were certain that they did not differ from the agency's.") (citing *WIFE*

and *Fed. Labor Relations Auth.*).  As such, it is clear that under D.C. Circuit law, the declarant

need not be the original decisionmaker in situations where it is permissible to consider *post-hoc*

justifications offered by the agency in the context of APA review.

Indeed, the propriety of the Johnson Declaration is further strengthened by two factors

emphasized in *WIFE*.  First, the *WIFE* court noted that the representations of an agency's counsel –

rather than an agency official or the original decisionmaker – may be relied upon in situations where

"[i]t is possible, perhaps likely, that no one presently has any better knowledge of the exact reasons

that underlay the adoption of the rule than agency counsel."  *WIFE*, 876 F.2d at 999 (noting that

"nearly twenty years" had passed between the issuance of the regulation and the litigation at hand).

Here, given that the initial 1998 revision was promulgated by the USDA approximately seven years

ago, *see* 64 Fed. Reg. 18553 (Apr. 15, 1999), codified at 7 C.F.R. § 1477 (2002), and during a

previous presidential administration, *see* Signing Statement of President William J. Clinton, 1998

U.S.C.C.A.N. 576, 579, it is quite likely that the original decisionmakers involved in the 1998

revision are no longer with the USDA, and Deputy Administrator Johnson is as knowledgeable as

any other present official as to the agency's rationales behind the revision.

Second, the *WIFE* court pointed out that deference to the representations of an agency's

counsel could be appropriate in a case where "there are special indicia of reliability," such as a

history of "consistent" litigation positions taken by the agency.  *WIFE*, 876 F.2d at 1000.  Here, the

USDA has consistently espoused rationales identical with those offered by Deputy Administrator

Johnson in an attempt to justify its disaster relief program in numerous litigations.  For instance,

under an older, outdated version of the regulation at issue in this case, *see* 7 C.F.R. § 1477.6

(1995), the USDA relied on many of the rationales forwarded by Deputy Administrator Johnson in

defending (unsuccessfully) its interpretation of that regulation in *Seibel* (1996) and *Pringle* (1998).

*See Seibel*, NAD Log. No. 95001879W, at 1-4; *Pringle*, 19998 U.S. Dist. LEXIS at *3, *16-*24.

Given these considerations, and the general rule that the Court may look beyond the original

decisionmaker for an agency's rationales in a *post-hoc* APA situation, Plaintiffs' argument that

Deputy Administrator Johnson is somehow incompetent to submit a declaration in this case is

misplaced.

c.      The Propriety of Supplementing the Record on APA Review

Plaintiffs, citing to *Esch v. Yeutter*, 876 F.2d 976 (D.C. Cir. 1989), admit that

supplementation of the administrative record might be appropriate in certain, albeit limited, cases,

but argue that "[t]he Johnson Declaration cannot be accepted to bolster or supplement the

government's record because no explanation appears in *any administrative record* over the last 5

years."  Pls.' Mot. to Strike at 5 (emphasis in original).  According to Plaintiffs, because "[t]he

USDA has *never* issued an agency statement or any public notice of the adoption of the [1998

revision], . . . [t]he declaration does not bolster a scanty administrative record, it creates one."  *Id*.

The *Esch* decision, and related rulings, stand for the principle that while a court is generally

confined to the administrative record upon APA review, "it may sometimes be appropriate to resort

to extra-record information to enable judicial review to become effective."  *Esch*, 876 F.2d at 991.

Indeed, as the D.C. Circuit stressed in *Esch*, "courts have developed a number of exceptions

countenancing use of extra-record evidence to that end" – approximately eight exceptions *in toto*. *Id*. Two points are worth noting under this argument offered by Plaintiffs. First, the situation and exceptions described in *Esch* are not particularly relevant or applicable to this case, given that courts generally resort to those exceptions when normal APA review operates and the basic rule that a court must confine itself to the administrative record is in effect. For example, when an agency is required to undertake "notice and comment" rulemaking, but some compelling factors argue for the expansion of the present administrative record, courts may look to *Esch* and its reasoning to expand that administrative record. *See id*. However, this situation is much more analogous to *WIFE*, where Congress waived such requirements, meaning that it would be natural to find that the agency's reasoning for a decision – as set forth in the initial administrative record – was paltry or non-existent. As the *WIFE* court explained, "[b]ut to require a *contemporaneous* explanation for the rule when the APA specifically exempted the agency from an obligation to provide it is not open to a reviewing court." *WIFE*, 876 F.2d at 998 (citations omitted) (emphasis in original). Accordingly, it is to be expected that the USDA has not provided a grand explanation of the 1998 revision during the years following its promulgation, as it was not required to do so. As described *supra* Section III(B)(2)(a)-(b), the reviewing court may look to *post-hoc* rationales offered by the agency in this situation.

Second, even if *Esch* and its progeny were applicable to this situation, it is quite likely that the first exception allowing supplementation, i.e., "when agency action is not adequately explained in the record before the court," would apply. *See Esch*, 876 F.2d at 991. As such, even assuming that this situation could fall under the type of case described in *Esch*, the Court concludes that Plaintiffs' argument would still be misplaced – simply, both precedent and fairness support the

principle that, once litigation has commenced, the agency may explain its regulations *post-hoc*

through an official declaration if Congress initially waived the need for that explanation.

d.       The Need for Further Material Information

Finally, Plaintiffs object to the Johnson Declaration based on an assertion that "[t]he Johnson

Declaration, standing alone, skews the record and leaves out material information in possession of

the agency." Pls.' Mot. to Strike at 6 (citing *Envtl. Def. Fund v. Blum*, 458 F. Supp. 650, 661

(D.D.C. 1978) for the proposition that an agency may not skew the record in its favor by excluding

pertinent but unfavorable information). Plaintiffs do not explain what this "material information" is,

but it appears that they are referring to *Seibel*, a 1996 USDA administrative ruling, and *Pringle*, a

1998 Eastern District of Michigan decision, each of which construe prior agency rules that operated

under a different, prior disaster program statute. *See id.* at 7. As the Court shall explain in greater

detail, non-precedential decisions such as *Seibel* and *Pringle* construing a substantially different set

of rules under a different statute are not particularly relevant to, let alone dispositive of, the

Secretary's authority to promulgate rules under the 2001/2002 CLDAP. Moreover, Plaintiffs

factual assertion is simply erroneous:  the USDA *does* discuss the *Pringle* decision (which, in turn,

followed the USDA's own administrative decision in *Seibel*) in its explanation of the modern

CLDAP rules following the 1998 revision. *See* Johnson Decl. ¶ 7. Indeed, the Johnson Declaration

explains the previous rules relevant to *Seibel* and *Pringle*, *see id.* ¶¶ 6, 8, the Secretary's

interpretation of those rules, *id.* ¶ 6, the *Pringle* decision itself, *id.* ¶ 7, and the reasons underlying

the 1998 revision wherein the USDA clarified the previous rule by adding in new language to

prevent disaster rate relief inequality based on varying cultural practices, *id.* ¶ 11.

Based on this erroneous argument that the Johnson Declaration has skewed the record by leaving out pertinent, unfavorable information, Plaintiffs suggest that "[i]f the Johnson Declaration is allowed, Plaintiffs should receive leave to file rebuttal declarations." Pls.' Mot. to Strike at 9. Plaintiffs contend that "[q]uite simply, rebuttal declarations would show the 'agency failed to consider factors which are relevant to its final decision.'" *Id.* (quoting *Delano v. Roche*, 391 F. Supp. 2d 79, 88 (D.D.C. 2005)). However, Plaintiffs (1) have already introduced a host of declarations regarding the higher market value of organic crops, *see* Partlo A.R. at 87-88 (Aff. of General Mills executive); Partlo A.R. at 91-92 (Aff. of CEO of Organic Valley Dairy); (2) have failed to identify who exactly would provide supplemental information, and what their relationship to USDA and the 1998 revision was; (3) base their request on an unproven contention that the Johnson Declaration somehow left out material information in possession of the agency; and (4) Plaintiffs themselves have already set forth in substantial detail across multiple filings their theory that the justifications espoused by Deputy Administrator Johnson are "utterly unreasonable and based on a misunderstanding of the way organic certification worked in 1999, and today," and contravened related Congressional statutes, *see* Pls.' Mot. to Strike at 10. As such, it is not clear what more would be added by any further declarations or why such declarations would even be appropriate.

Based on these considerations, the Court concludes that, in this situation, (1) a consideration of the Johnson Declaration and the rationales offered therein is appropriate under APA review, and (2) there is no basis upon which to provide Plaintiffs with a further opportunity to seek out unidentified individuals for further declarations to provide unknown additions to the present record. Accordingly, the Court shall deny Plaintiffs' Motion to Strike the Johnson Declaration or Alternatively, to File Rebuttal Declarations. Given that the Court has already reviewed the basic

standards under APA review and delineated the breadth of the record that it will consider in the

context of that review in this case, the Court shall now proceed to a discussion of the actual merits of

Plaintiffs' APA challenge.

3. <u>Plaintiffs' APA Challenge</u>

 The Court's review of Plaintiffs' APA claims will proceed over three steps of analysis.

First, the Court shall address the question of standing – i.e., precisely what rules are being

challenged by Plaintiffs, and under what regulations do Plaintiffs have standing to bring their APA

challenge?  Second, the Court shall consider Plaintiffs' *ultra vires* argument, and move to a

discussion of what level of deference – if any – is properly afforded the USDA in the context of a

*Chevron* APA review.  Third, and finally, the Court shall look at whether the applicable disaster

relief rules were "arbitrary and capricious," or whether the agency itself has offered a reasonable

basis for the ultimate parameters of the relevant regulations.

a. Standing:  What Rules Are to Be the Subject of the Court's APA<br>Inquiry?

 A review of Plaintiffs' APA-related arguments reveals that Plaintiffs spend a significant

portion of their effort attempting to convince the Court that the 1998 revision itself was an "arbitrary

and capricious" act by the Secretary.  *See, e.g.*, Pls.' Mot. for Summ. J. at 7-13.  The 1998 revision

altered the language of the applicable disaster relief rate rule from

> Separate payment rates and yields for the same nonprogram crop shall be
> established, in accordance with instructions issued by the Deputy Administrator,
> when there is supporting data from [the National Statistics Service ("NASS")] or
> other sources approved by CCC [the Commodity Credit Corporation].

7 C.F.R. § 1477.6 (1995), to:

> Separate payment rates and yields for the same crop may be established according to
> instructions issued by the Deputy Administrator, when there is supporting data from
> NASS or other sources approved by CCC that show there is a significant difference

49

in yield or value based on a distinct and separate end use of the crop. *In spite of differences in yield or values, separate rates or yields shall not be established for crops with different cultural practices, such as organically or hydroponically grown.*

7 C.F.R. § 1477.202(d) (2002) (emphasis added).  However, in directing their analysis to the original enactment of the 1998 revision, as set forth in the 1998 CLDAP, Plaintiffs have overlooked one central principle of law.

"No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 37, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)).  A core element of Article III's case-or-controversy requirement is that a plaintiff must establish that he or she has standing to sue. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).  To satisfy this burden of establishing standing, "[a] plaintiff must allege a personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *see also Nat'l Wildlife Fed'n v. Hodel*, 839 F.2d 694, 704 (D.C. Cir. 1988).  The party invoking federal jurisdiction "bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130.  Indeed, the Supreme Court has "consistently stressed that a plaintiff's complaint must establish that he has a 'personal stake' in the alleged dispute, and that the alleged injury is particularized as to him." *Raines*, 521 U.S. at 819, 117 S.Ct. 2312.

As noted above, upon a plain reading of Plaintiffs' Motion for Summary Judgment, it is clear that Plaintiffs purport to challenge CLDAP program rules, but they are somewhat unclear

concerning which rules they challenge. *See* Pls.' Mot. for Summ. J. at 9-10 (discussing rules for the 1998, 2000, and 2001/2002 CLDAPs); *see also* Pls.' Consol. Reply at 1, 10-13, 16-18, 19-21 (challenging a 1998 CLDAP rule, 7 C.F.R. § 1477.202(d) (2000), and claiming that the 1998 and 1999 CLDAP program rules are void).  The clarification/alteration/amendment that Plaintiffs purport to challenge often appears to be the 1998 revision itself, which was first promulgated by the Secretary pursuant to a broad grant of Congressional authority in 1999. *See* 64 Fed. Reg. 18553. However, the 1999 rule only covers claims for CLDAP payment determinations for crop losses incurred in 1998. *See id.*  Plaintiffs do not challenge a determination based on alleged losses from *that* crop year; rather, their challenge stems from a determination of how much assistance they could receive under the 2001/2002 CLDAP, for losses incurred in 2001. *See, e.g.*, First Consol. Compl. ¶¶ 30-33; *id.* ¶¶ 19-20, 24, 28-42 (discussing Plaintiffs' claims for 2001 crop year under 2001/2002 CLDAP).  Importantly, the rule covering the determinations which Plaintiffs now appeal was indeed *based on* the 1998 CLDAP rules (i.e., the 1998 revision), but it was promulgated by the Secretary in 2003, pursuant to a 2003 Act of Congress. *See* Pub. L. No. 108-7, 117 Stat. 11, 538, § 202 (2003); 68 Fed. Reg. 37936 (June 26, 2003), codified at 7 C.F.R. § 1480 (2004).

Because Plaintiffs do not allege, nor have they produced any evidence suggesting, that they sought or were denied any benefit under the 1998 CLDAP, they do not have standing to challenge the 1998 CLDAP rules and have failed to establish the Court's subject matter jurisdiction to consider such a challenge.  Simply, Plaintiffs have not suffered any injury that can fairly be traced to the Secretary's promulgation of the 1998 CLDAP rules because they did not seek and were not denied benefits under those rules; vacatur of the 1998 CLDAP rules would not redress Plaintiffs' claims for higher rates of disaster relief under the 2001/2002 CLDAP.

In contrast, Plaintiffs *did* seek – and did receive – a benefit under the 2001/2002 CLDAP. Therefore, Plaintiffs certainly have standing to challenge the promulgation of the 2001/2002 CLDAP rules pursuant to the APA. It is hardly the case that this distinction would ensure that "the [pertinent] rule would forever be insulated from judicial review as in excess of statutory authority," as suggested by Plaintiffs. *See* Pls.' Consol. Reply at 40. To the contrary, this Court will consider Plaintiffs' APA challenge to the 2001/2002 program rules under the relevant authorizing statute; Plaintiffs have personal stakes in the operation of the 2001/2002 program rules, and can similarly claim particularized injury under those rules.[8] Accordingly, Plaintiffs' lengthy arguments concerning the promulgation of the earlier 1998 rule under an earlier statute that did not govern their applications for assistance are irrelevant to their claims. *Cf. Williams v. Principi*, 310 F.3d 1374, 1380 (Fed. Cir. 2002) (plaintiffs who were denied benefits prior to implementation of a rule lacked standing to challenge that rule) (citation omitted). This distinction – i.e., the fact that the Court is to conduct an APA review of the 2001/2002 CLDAP, not the 1998 CLDAP – will prove significant, as discussed in the next section regarding *Chevron* and agency deference.

b.    *Ultra Vires*, *Chevron*, and Agency Deference

Plaintiffs repeatedly claim that "Congress did not authorize the agency to adopt the challenged portion of the rule," i.e., the 1998 revision. Pls.' Mot. for Summ. J. at 9; Pls.' Consol. Reply at 10 ("Congress did not direct or authorize the organic prohibition . . . ."). Plaintiffs stress that Congress' statements since the 1998 revision are devoid of any direct reference to the substantive change enacted by the USDA; as such, "[t]he agency's failure to undertake notice and

---

[8] Similarly, a party who alleged injury under the 1998 CLDAP program relating to crop losses from that year could challenge the program's rules under the APA, as long as his claim was otherwise jurisdictionally proper.

comment rulemaking, and its failure to inform any farmer of the changes it made, and the noticeable

absence of any Congressional statement in the appropriations bills regarding organic farmers or [sic]

their rights under the disaster program, leaves this Court with nothing but silence."  Pls.' Mot. for

Summ. J. at 10.  Because there is "nothing but silence" concerning the 1998 revision, Plaintiffs

claim that the regulatory provision is *ultra vires*.  *See id*. at 9-10.  Given these considerations,

Plaintiffs suggest that the Secretary's promulgation of the 1998 revision is owed little or no

deference under the APA.

        Upon a review, it is clear that Plaintiffs fundamentally misconstrue both the relevant Act as

well as the Executive's delegated authority to administer programs.  It is axiomatic that Congress

may leave policy decisions – such as, here, whether to provide special disaster relief rates for special

cultivation practices – to the discretion of an executive branch agency.  Indeed, in the modern

administrative state, that is exactly the function of the various highly specialized agencies.

Accordingly, Plaintiffs' repeated assertion that the pertinent statute did not contain, *e.g.*, the word

"organic" is spurious.  *See id*. at 10.  Rather, "[t]he power of an administrative agency to administer

a congressionally created program . . . necessarily requires the formulation of policy and the making

of rules to fill any gap left, implicitly or explicitly, by Congress."  *Chevron*, 467 U.S. at 843, 104

S.Ct. 2778 (quoting *Morton v. Ruiz*, 415 U.S. 199, 213, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974)).

        In this case, though, there can be little room for interpretation of how Congress wanted the

2001/2002 CLDAP – the CLDAP at issue and the only CLDAP for which Plaintiffs have standing

to challenge – to be run.  When Congress authorized the 2001/2002 CLDAP under which Plaintiffs

received disaster relief assistance for their crop failures, it instructed the Secretary to "make

assistance available . . . *in the same manner* as provided under" the previous CLDAP, i.e., the 2000

CLDAP.  Pub. L. No. 108-7, 117 Stat. 11, 538, § 202(b)(2) (emphasis added).  It is undisputed that

the 2000 CLDAP was administered with the 1998 revision in place – that is, with equal treatment

for all producers regardless of their cultivation methods, whether organic or conventional/chemical.

*See* 7 C.F.R. § 1480.12(c) (2002).  Therefore, Plaintiffs' claim that the 2001/2002 CLDAP,

incorporating the 1998 revision, was *ultra vires* is untenable:  Congress spoke directly to the

question of how the Secretary should administer the 2001/2002 program, and "that is the end of the

matter."  *Chevron*, 467 U.S. at 842-43, 104 S.Ct. 2778.  "As in any case of statutory construction,

[the court's] analysis [should] begin[] with the language of the statute . . . . And where the statutory

language provides a clear answer, it ends there as well."  *Hughes Aircraft Co. v. Jacobson*, 525

U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999) (citation and internal quotation marks

omitted).  As such, the Court must "presume Congress meant precisely what it said."  *Nat'l Pub.

Radio, Inc. v. Fed. Commc'ns Comm'n*, 254 F.3d 226, 230 (D.C. Cir. 2001); *see also Belland v.

Pension Benefits Guar. Corp.*, 726 F.2d 839, 844 (D.C. Cir. 1984) (rejecting argument that the

government's decision was arbitrary, capricious, and an abuse of discretion where, *inter alia*, it

"complied with the statute's plain language").

Moreover, even if Congress' plain language could somehow be labeled "ambiguous," the

Secretary's interpretation of the statute is a reasonable construction due substantial deference.  *See*

*Barhart v. Walton*, 535 U.S. 212, 217, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002); *Rust v. Sullivan*,

500, U.S. 173, 184, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991).  Indeed, three separate Courts of

Appeals have considered similar delegations to the Secretary under the same or similar Acts of

Congress, and each have uniformly found the delegations to be both expansive and proper.  *See Milk

Train, Inc. v. Veneman*, 310 F.3d 747 (D.C. Cir. 2002) (finding that a similar delegation to the

Secretary under the same Act, and succeeding Act, was proper and left the program design

54

committed to the agency's discretion by law); *McDaniels*, 300 F.3d at 408-09 (discussing 1998

CLDAP; explaining "we cannot imagine how Congress could have been more clear in its [broad]

delegation of authority to the Secretary"); *Dairy Producers of N.M. v. Veneman*, 37 Fed. Appx.

471 (10th Cir. 2002) (rejecting argument that similar delegation of authority to the Secretary under

the same Act was unconstitutionally broad).  Given this broad delegation of authority, it is hard to

see how Plaintiffs' interpretation of the statute – i.e., that the Secretary should have responded to

Congress's command that the 2001/2002 CLDAP be administered "in the same manner as" under

the 2000 CLDAP by administering the 2001/2002 program *differently* – is even reasonable.  *See*

Johnson Decl. ¶ 13 ("even if the Secretary believed special payments for special cultivation practices

was sound policy, he did not have statutory authority to implement the 2001/2002 program (or

subsequent programs) with such special treatment for cultural practices and without the cultural

practices clarification"); *see also Your Home Visiting Nurse Servs., Inc. v. Shalala*, 525 U.S. 449,

453, 119 S.Ct. 930, 142 L.Ed.2d 919 (1999) ("The Secretary's reading of [the statute] frankly

seems to us more natural – but is in any event well within the bounds of reasonable interpretation,

and hence entitled to deference under *Chevron*.").

Despite the unambiguous command of Congress for the USDA to conduct the 2001/2002

CLDAP as the 2000 program was conducted (with the 1998 revision in place), Plaintiffs' assert,

without any support, that the clarification "appears to have gone unnoticed" by Congress and,

therefore, should not have been included in the 2001/2002 program regulations.  *See* Pls.' Mot. for

Summ. J. at 10-11.  Even if the absence of the sort of express endorsement that Congress actually

provided to the Secretary for his prior conduct of CLDAP programs or its mandate that the Secretary

continue in the same fashion, it is well established that Congress is presumed to have knowledge of

judicial and administrative interpretations when it re-enacts the earlier laws without change or

amended other provisions of the statute without altering the provision interpreted by the agency.

*See, e.g.*, *Barhart v. Walton*, 535 U.S. 212, 220, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002) (such

silence indicates "that Congress intended the Agency's interpretation, or at least understood the

interpretation as statutorily permissible"); *Commodity Futures Trading Comm'n v. Schor*, 478

U.S. 833, 845-46, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986) ("It is well-established that when

Congress revisits a statute giving rise to a longstanding administrative interpretation without

pertinent change, the 'congressional failure to revise or repeal the agency's interpretation is

persuasive evidence that the agency's interpretation is the one intended by Congress.'") (quoting

*Nat'l Labor Relations Bd. v. Bell Aerospace Co.*, 416 U.S. 267, 274-75, 94 S.Ct. 1757, 40

L.Ed.2d 134 (1975) (footnotes omitted)).  As such, when Congress enacted the 2001/2002 CLDAP,

explicitly in identical form to the 2000 CLDAP statute and without any indication of disapproval of

the Secretary's earlier law (including, in particular, the 1998 revision which explicitly refused to

provide different disaster relief rates based on cultural practices), it effectively endorsed the

Secretary's existing administration and interpretation.  This was not "silence," as Plaintiffs contend,

but a loud and clear endorsement of the Secretary's policies, as well as a mandate that those policies

continue.

        c.      Plaintiffs' Remaining APA Challenges to the 2001/2002 CLDAP

As discussed *supra* Sections III(B)(2) & (B)(3)(b), Plaintiffs' previous APA-related

arguments – i.e., that the 2001/2002 CDLAP, re-incorporating the 1998 revision, was somehow

"arbitrary and capricious" because the USDA failed to offer justifications for the 1998 revision at

the time of its promulgation or because the Secretary's actions were contrary to or without Congress

support – are without merit.  Plaintiffs' remaining APA arguments can be grouped into three

categories for purposes of analysis:  (1) the 2001/2002 CLDAP, with the 1998 revision incorporated

therein, is arbitrary and capricious because it creates an irreconcilable conflict with the OFPA and NOP, which created separate end markets for organic products and recognized meaningful distinctions between organic and conventional cultivation practices, *see* Pls.' Consol. Reply at 10-18; Pls.' Mot. for Summ. J. at 13-14, 15-17; (2) the USDA's subsequent construction of the disaster relief program under the 1998 revision conflicts with both *Seibel* and *Pringle*, and the 2001/2002 CLDAP represents an illegitimate attempt by the Secretary to "circumvent" those rulings, *see* Pls.' Consol. Reply at 29-30; Pls.' Mot. for Summ. J. at 18; and (3) the USDA's 1998 revision lacks a "reasoned basis," and is therefore "arbitrary and capricious" in violation of the APA, *see* Pls.' Consol. Reply at 22-29; Pls.' Mot. for Summ. J. at 19-22.  Each of these arguments is without foundation.

> i.    *Plaintiffs' Argument that the CLDAP Must be Read In Pari Materia With the OFPA and NOP*

Plaintiffs attempt to make much of the 2002 Farm Bill; the Organic Foods Production Act ("OFPA") and the National Organic Program ("NOP"), under which the Secretary administers regulations pursuant to that Act; and the Noninsured Crop Disaster Assistance Program ("NAP"). As discussed *supra* Section III(B)(3)(b), in subsequent disaster programs with the same purpose, ranging from the 1998 CDLAP to the 2003, 2004, and 2005 CLDAP, Congress has explicitly told the Secretary that it approves of his conduct; indeed, there can hardly be a clearer Congressional endorsement.  However, Plaintiffs claim that these other statutes and programs, enacted in service of separate purposes, undermine the 1998 revision (and its subsequent re-enactments) and instead support different disaster rates for different cultural practices.  A review of these statutes and programs reveals that Plaintiffs are misguided.

First, Plaintiffs assert that organic research, marketing, and reporting initiatives in the 2002 Farm Bill somehow support their argument that there should be special disaster assistance payments rates for organic producers.  *See* Pls.' Mo. for Summ. J. at 17.  Two points undermine this claim: (1) while Congress supports the Secretary's NOP, *see* 7 C.F.R. § 205 *et seq.*, and related initiatives, such support does not alter the explicit Congressional ratification of the Secretary's 1998 and 2000 CLDAP rules (and therefore, the 2001/2002 CLDAP regulations at issue here); and (2) the 2002 Farm Bill actually created farmer assistance programs that – like the post-1998 CLDAPs – provide no special payments or treatment for special cultivation practices such as organic farming, *see generally* 7 U.S.C. § 7901 *et seq.* (authorizing support payments and subsidized loans to farmers that are neither increased nor decreased based on cultural practices).

Second, Plaintiffs turn to the OFPA as support for their claim that Congress has explicitly recognized that important differences exist in cultural practices and that a separate end market for organic products exists; Plaintiffs suggest that these distinctions embodied within the OFPA should be read *in pari materia* with any CLDAP and therefore continue across disaster relief rates.  *See* Pls.' Mot. for Summ. J. at 13-17; Pls.' Consol. Reply at 16-17.  Indeed, Plaintiffs stress that "[f]ederal rules are to be construed *in pari materia* with respect to clearly related statutes," such as the OFPA.  *See* Pls.' Consol. Reply at 16.  However, Plaintiffs' *in pari materia* argument is ultimately flawed.  Such a required reading "might be a sensible construction of the two statutes [*only*] if they were intended to serve the same function, but plainly they were not."  *Erlenbaugh v. United States*, 409 U.S. 239, 245, 93 S.Ct. 477, 34 L.Ed.2d 446 (1972); *see also United States v. Granderson*, 511 U.S. 39, 50-51, 114 S.Ct. 1259, 127 L.Ed.2d 611 (1994) (rejecting *in pari materia* argument where the underlying purposes of the two statutes differ); *Common Cause v. Fed.*

*Elections Comm'n*, 842 F.2d 436, 441-42 (D.C. Cir. 1998) ("For statutory provisions to be construed together under the *in pari materia* doctrine . . . they must relate to the same subject or object.").

In this case, the OFPA and CLDAPs have markedly different purposes.  The OFPA was intended "to establish national standards governing the marketing of certain agricultural products as organically produced products" and create a certification program for those products.  *See* 7 U.S.C. § 6501(1); *see also* House Conf. Rep. No. 101-916, at 1174-75, *reprinted in* 1990 U.S.C.C.A.N. 5286, 5699-70 (discussing development of statement of purpose of OFPA).  Pursuant to the OFPA, a time-consuming, resource-intensive process takes place to verify that producers use organic cultivation methods.  In contrast, the 2001/2002 was intended to provide urgent, emergency assistance to all farmers who lost crops due to a disaster, as soon as practicable.  *See* Pub. L. No. 108-7, 117 Stat. 11, 538, § 202.  Simply, the OFPA has substantially different goals and targets than the CLDAPs.  Moreover, the additional burden to verify a producer's cultivation methods (and a focus on a producer's cultivation methods) is obviously appropriate under the OFPA, but would neither be appropriate nor helpful under a disaster assistance program intended to get basic assistance to farmers as soon as practicable.  *See* Pub. L. No. 105-277, 112 Stat. 2681, § 824(a); *see also McDaniels*, 300 F.3d at 411 (in 1998 CLDAP Act, "Congress appropriated the money on an emergency basis and directed that regulations be promulgated as soon as practicable, bypassing public notice and comment, as well as prior congressional review.").  Given the different needs and goals of the OFPA and CLDAP, it is clear that – contrary to Plaintiffs' assertions – the 2001/2002 CLDAP, re-incorporating the 1998 revision, does not in any way conflict with the OFPA.

Third, and finally, Plaintiffs in their Reply state that rules for another program, the NAP, operated under 7 U.S.C. § 7333, "explicitly recognized 'organic' farming practices as a factor in

determining program benefits." Pls.' Consol. Reply at 3, 9 (construing 7 C.F.R. § 1437.7(b) (1999)). Through this argument, Plaintiffs imply that an individual farmer's cultivation practices were relevant when the USDA determined his CLDAP payment rate – an implication that is false as well as unsupported by citation to the NAP rules. In contrast, the cited NAP rule simply states that the USDA should consider "different farming practices in the *county*," including various cultivation methods, when determining expected yields for farms in that county. *See* 7 C.F.R. §§ 1437.7(a)-(b) (1999) (emphasis added); *cf. id.* § 1437.3 (defining "average market price" paid to farmers under NAP without reference to cultivation methods). Indeed, in the NAP, like the pertinent 2001/2002 CLDAP, the USDA does not pay special rates based on particular cultivation practices. *Id.*

Accordingly, it is clear that the 2002 Farm Bill, the OFPA, and the NAP fail to provide support for Plaintiffs' position. Indeed, many of these acts and programs fail to distinguish between cultural practices in certain key areas or have vastly different goals and targets. As such, they cannot be read *in pari materia* with the CLDAPs. Moreover, the 2001/2002 CLDAP – as administered in this case – simply does not conflict with these acts and programs. Plaintiffs' argument is therefore without support.

ii.    *Plaintiffs' Reliance on Seibel and Pringle*

Plaintiffs' frequently rely on a 1996 USDA administrative decision, *Seibel*, NAD Log. No. 95001879W, and a 1998 Eastern District of Michigan decision, *Pringle*, 1998 U.S. Dist. LEXIS 19378, in support of their argument that the 2001/2002 CLDAP, by incorporating the 1998 revision, conflicts with these rulings and therefore violates the APA. *See, e.g.*, Pls.' Mot. for Summ. J. at 2-3, 18; Pls.' Consol. Reply at 2-3. These two decisions are irrelevant to the present dispute for numerous reasons.

60

Importantly, the 1998 revision altered the disaster rate relief language in the 1998 CLDAP, and was re-incorporated into all subsequent CLDAPs.  As such, it is plain that under the 2001/2002 CLDAP rules that "separate rates or yields shall not be established for crops with different cultural practices, such as organically or hydroponically grown." 7 C.F.R. § 1480.12(d) (2002).  The *Seibel* and *Pringle* decisions (both pre-1998 revision) dealt with prior disaster assistance rules issued under a prior disaster assistance statute – not the 2003 Act that created the 2001/2002 CDLAP at issue in this case under which Plaintiffs seek higher relief rates, nor the 1999 Appropriations Act that created the 1998 CLDAP, nor any of the other enactments creating the modern series of CLDAPs.  Those prior disaster rules simply are not at issue in this case.  Indeed, both the *Seibel* and *Pringle* decisions addressed the interpretation of earlier regulations which were much less explicit in their parameters, and much more opaque as to the Secretary's intent.  *Compare* 7 C.F.R. § 1477.6 (1995) *with* 7 C.F.R. § 1480.12(d) (2002).  Therefore, while the *Pringle* court did find (under the old set of rules) that "organic" was a separate and distinct "end use," *see* 1998 U.S. Dist. LEXIS 19378, even assuming that the *Pringle* court's interpretation of the regulations then in force was correct, its ruling was not tied to any Congressional or statutory principle.  It would be fully inconsistent with the rules governing Plaintiffs' claims (the 2001/2002 CLDAP regulations), which include the 1998 revision, to look at earlier cases that interpreted CDLAP rules that (1) lack the important clarifying language in the post-1998 CLDAPs, and (2) lacked the repeated Congressional command that the Secretary administer subsequent CLDAPs "in the same manner" as the 1998 CLDAP.

Nor is it the case, as Plaintiffs repeatedly assert, that the Secretary – by amending the relief rate language – somehow sought to "circumvent" the *Pringle* ruling.  It is uncontested that the Secretary abided by that ruling, although he did not agree with it, *see* Johnson Decl. ¶ 7, by paying the plaintiffs in that case as ordered.  However, it is important to note that the Eastern District of

Michigan did not rule that its interpretation was *required* by the relevant law; for that matter, it did not even consider the underlying law.  *See Pringle*, 1998 U.S. Dist. LEXIS 19378.  In any event, it was certainly proper for the Secretary to issue a new rule, with the 1998 revision clarifying disaster relief rate coverage, under the new 1998 CDLAP after its enactment, pursuant to Congress' broad delegation of administrative authority to the Secretary.  As such, *Seibel* and *Pringle* are not particularly relevant or controlling given the changed circumstances of this case.

       iii.    *The "Reasoned Basis" of the 2001/2002 CLDAP Rules*

Plaintiffs' final argument, that the USDA's 1998 revision lacks a "reasoned basis," and is therefore "arbitrary and capricious" in violation of the APA, *see* Pls.' Consol. Reply at 22-29; Pls.' Mot. for Summ. J. at 19-22, has been touched on in previous sections of this Memorandum Opinion dealing with the APA, as well as in the Court's discussion of Equal Protection.  In short, the 2001/2002 CLDAP rules were promulgated properly pursuant to explicit Congressional instructions that they closely adhere to the 2000 crop year CLDAP regulations (which also included the 1998 revision) and under a waiver of APA notice and comment provisions.  Under Step 1 of the *Chevron* test, "that is the end of the matter," and the rule must be upheld.  *See Chevron*, 467 U.S. at 842-43, 104 S.Ct. 2778.

However, even if the Court were to proceed with a *Chevron* review, a consideration of the rationales offered in the Johnson Declaration reveals that those rationales are sufficiently valid as to constitute a "reasoned basis" for the Secretary's refusal to provide higher disaster assistance relief rates to organic farmers.  *See* Johnson Decl. ¶ 11(A)-(D).  As noted previously, *see supra* Section III(A)(3), the rational need for administrative efficiency in the prompt implementation of the CLDAP, as well as fairness in the distribution of limited resources, more than justifies the equal

treatment of all producers, regardless of varying cultural practices.  *Cf. McDaniels*, 300 F.3d at 413

(In the context of the 1998 CLDAP, "[t]he choice of measuring a farmer's economic strength by

gross revenue can rationally be justified as a way to 'allow relief to be made available quickly, and

effectively, within the limits of the funding available for this program.'") (quoting 64 Fed. Reg.

18553, 18554 (Apr. 15, 1999)).

Accordingly, the rule in question is no more arbitrary and capricious – and no more

irrational – than it is a violation of Equal Protection.  Indeed, the Johnson Declaration also provides

further evidence, if any is needed, that the Secretary's promulgation in CDLAPs subsequent to the

1998 program – particularly including the 2001/2002 CLDAP program under which Plaintiffs now

seek higher relief rates – was entirely proper, not arbitrary and capricious.  Ultimately, Congress

instructed the Secretary to administer the 2001/2002 CLDAP as he had the 2000 CLDAP which, in

turn, he had been told to administer largely as he had the 1998 CLDAP; that is, with the 1998

revision ensuring equal relief rates for all producers in place.  *See, e.g.*, Johnson Decl. ¶ 13.  This

was also plainly rational on the part of Congress:  consistent administration would enable the USDA

to get farmers their emergency disaster assistance quickly, in accordance with Congressional goals.

As such, Plaintiffs' APA challenge(s) must fail:  while Plaintiffs may disagree with the soundness of

the end policy result of the CLDAPs, which continually have re-enacted the 1998 revision, the Court

cannot say that the 1998 revision or the 2001/2002 CLDAP were "arbitrary or capricious" or

lacking in a "reasoned basis."

**IV: CONCLUSION**

For the reasons set forth above, the Court shall deny Plaintiffs' Motion for Summary Judgment, grant Defendants' Cross-Motion for Summary Judgment, and deny Plaintiffs' Motion to Strike.  An appropriate Order accompanies this Memorandum Opinion.


Date:   June 11, 2006

_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge

64